**Petition of SMITH.**
No. 67516.

District Court, D. New Jersey.
April 30, 1947.

---

[1] Title 8 U.S.C.A. § 738.
[2] Title 8 U.S.C.A. § 707(a).
[3] Chap. 606 Laws of 1933.
[4] Matter of Mahel, 155 Misc. 228, 274 N.Y.S. 625.
[5] United States v. Rubia, 5 Cir., 110 F. 2d 92.

James Dillon, of Newark, N. J., Naturalization Examiner for the Immigration and Naturalization Service.

George R. Sommer, of Newark, N. J., for petitioner.

FAKE, District Judge.

The petitioner is a native of England. He filed his petition here seeking naturalization. The government contends that he is not of good moral character because he obtained a Mexican divorce, and neither he nor his wife in that proceeding were Mexican residents at the time, nor did either of them appear personally at the trial in Mexico and thereafter he entered into a ceremonial marriage in New Jersey with Evelyn M.

This court has heretofore on at least one occasion held, syllogistically, that such a divorce being invalid, a subsequent marriage was bigamous and it followed therefore, as a matter of logic, that petitioner was of bad moral character. There was something interesting in the attitude and demeanor of the petitioner in this case, perhaps it was his integrity and his old-fashioned, fearless tenacity in insisting upon his rights as he understood them. It will be noted that here I have come to the conclusion that this applicant is, notwithstanding his Mexican divorce and subsequent marriage, a man of good moral character. It appears from the record that petitioner has successfully qualified for admission to citizenship as to each of the other tests required by the statute.

Petitioner is a chemical engineer with a degree from the University of London, a man of culture and refinement. He migrated from England to this country in the year 1930 to better his financial condition, leaving behind him a wife and two infant children. His wife refused to accompany him on the journey and has since continuously refused to join him in a marital domicile here. For some years after leaving England however, he supported his wife on the other side and he also supported his children as long as they needed support or were willing to acknowledge the receipt of support. He is now about 57 years of age and, I gather, has at all times desired the comforts of a home and the companionship afforded by the marital relation. The refusal of his wife to join him here was unjustified and after the lapse of some years he met and became interested in Miss Evelyn M., with a view to matrimony. He then considered the subject of divorce with the thought of freeing himself from his English wife as quickly as possible so he might lawfully enter upon another marriage. He advised with lawyers and found, so he says, that to obtain a divorce in New Jersey, where he resides, would involve a further delay of two years. The lady of his choice was nearing an age when offspring would be impossible and she desired to have children. He then proceeded, on the advice of counsel and in good faith so far as he was concerned, to obtain a divorce in Mexico where such actions are dealt with speedily and without the expense and inconvenience of a change of domicile. No fraud was involved in the Mexican proceeding. He received a decree of absolute divorce issued out of the Mexican court on

July 21, 1939. Shortly thereafter in August, he contracted a ceremonial marriage with Evelyn M.

It is urged by the government that in obtaining the Mexican divorce and being charged in law with knowledge of its invalidity in New Jersey and then deliberately marrying another wife, he evidenced bad moral character.

■ As bearing upon the question of moral character, it is well to examine into the criminal law of New Jersey to ascertain whether petitioner has committed a crime under the law of the state and if so, the nature of that crime in so far as moral turpitude is a factor. There can be no doubt that the decree of divorce obtained in Mexico is, as such, invalid in New Jersey since the Mexican court was without jurisdiction "* * * Domicile of at least one of the parties is indispensably necessary to confer jurisdiction on a court to grant a divorce * * *." Cox v. Cox, 1945, 137 N.J.Eq. 241, 44 A.2d 92, 96.

It appears that petitioner, since the marriage ceremony with Evelyn M., has resided with her and they have held themselves out as husband and wife in the community in which they live. Is this a bigamous relation? The New Jersey criminal statute, in so far as pertinent, provides as follows:

"Any person who, having a husband or wife living, marries another person, shall be guilty of bigamy, and punished by a fine not exceeding one thousand dollars, or imprisonment at hard labor not exceeding ten years, or both.

"Nothing in this section contained shall extend to:

"a. Any person whose husband or wife shall be continually remaining without the United States for the space of five years together; or b. * * * c. * * * d. * * *." N.J.S.A. 2:113–1.

■ It appears here that petitioner's English wife had remained continuously without the United States for a space of five years. His relationship with Evelyn M. is therefore not bigamous within the intent of the criminal law of this state.

■ Is the relationship in this case adulterous? No! Since that crime depends upon a sexual relation with a married wo-man and the woman in this case was a feme sole. The New Jersey statute on the subject is very brief, "Any person who shall commit adultery shall be guilty of a misdemeanor." N.J.S.A. 2:106–1. This leads to the case law of New Jersey for a definition of adultery. Mr. Justice Ford, sitting in the New Jersey Supreme Court in the year 1838, went into the subject of adultery exhaustively in the manner of an analytical scholar. State v. Lash, 16 N.J.L. 380, 32 Am.Dec. 397. That opinion is indeed illuminating and should be read in connection with this case. He there rules: "* * * adultery can be committed only with a married woman" and he goes back to the "imperishable commentaries of Blackstone" and even earlier for source material. That definition remains unchanged to this date.

As to fornication: It appears, as has been stated, that petitioner is living with Evelyn M. and they are holding themselves out as husband and wife. The evidence shows that this includes all the privileges incident to the marital relation. The present statute on fornication reads as follows:

"Any person who shall commit fornication shall be guilty of a misdemeanor, and punished by a fine not exceeding fifty dollars, or imprisonment not exceeding six months, or both." N.J.S.A. 2:133–1.

Here again it will be noted that further definition is necessary. During the reign of Queen Anne and in the year 1704, a criminal statute was enacted in the Colony of New Jersey making fornication an offense without expressly defining fornication and inflicting a penalty only when issue was born of the offense. This left the way open for judicial interpretation and Mr. Justice Kinsey in Smith v. Minor, 1 N.J.L. 16, in the year 1790 construed the law in a slander case, in the following language: "* * * I am fully satisfied from the whole tenor of the section, which is very inaccurately worded, that no fornication unless that consequence (birth of issue) does follow is indictable under this act and that such was the intention with which it was made, because * * * 4. when the act proceeds to point out the punishment to be inflicted upon the man it cannot be construed to extend to any other fornication than such as is followed by issue."

In dealing further with the subject, Justice Kinsey said, " * * * it would subject behavior perhaps at worst merely imprudent, to critical investigation; and leave the actions and behavior of innocent persons exposed to idle conjecture, to unwarrantable construction and impertinent curiosity; and the indecency of the inquiries would produce more harm than prosecutions would do good."

Thus it will be noted that there was no doubt at an early date, that fornication standing alone, in the absence of issue born, involved no more than "behavior perhaps at worst merely imprudent."[1]

It appears that the word fornication is used in the statutes from 1796 to this date without further definition than the word itself connotes. In a late case, State v. Brenner, 1945, 132 N.J.L. 607, 41 A.2d 532, 534, Mr. Justice Heher says: "Neither adultery nor fornication is a criminal offense at common law, unless by the manner of its commission it constitutes a public nuisance." To the same effect is State v. Lash, 1838, 16 N.J.L. 380, 32 Am.Dec. 397. In the Brenner case, Mr. Justice Heher was dealing with conduct comprising lewdness under N.J.S.A. 2:140-1. He said: "It is not a question of morals, but one of law; and the legislative expression must be interpreted by the principles of the common law."

The several offenses which I have briefly explored above have been considered here only for the purpose of ascertaining whether petitioner by his forced admissions on the witness stand has tended to convict himself of one or more of those offenses which immediately arise in the mind when his status and conduct are considered. The thought being that if he is guilty of any one or more of them, such guilt might be considered, merely as a factor however, in obtaining an understanding of the character of the man.

Sight must not be lost of the fact that the inquiry here is directed against the petitioner solely for the purpose of evaluating and weighing his conduct and mental processes as they have bearing upon his moral character. His reputation is not under scrutiny and it is assumed to be good in the absence of any attack upon it. No question of open lewdness is involved, N.J.S.A. 2:140-1 and see Schoudel et al. v. State, 57 N.J.L. 209, 30 A. 598.

I have before me a voluminous file containing letters written by the petitioner bearing upon his divorce difficulties, letters from attorneys, and other written matter. The spirit and intent of the petitioner is often disclosed by the file as being directed to a valid divorce, not only one of validity here but one that would be recognized as valid to free his wife in England as well. A reading of this file in connection with his testimony at the two hearings held before me discloses that he was functioning in good faith and had a strong desire to do the right thing as he, a cultured layman, saw it. On one occasion at least, he visited the British Consul in New York and came away with the impression that a Mexican divorce would be stronger in England than a divorce obtained in an American state. He testified on December 6, 1946, page 9 of the record, " * * * as far as the British point of view * * * was concerned, it would be easier for them to recognize the Mexican divorce, which would be recognized anywhere in Mexico than an American divorce which might be recognized in one state and not in another; * * *." This, when read with the entire record, indicates a strong desire on the part of the petitioner to act in all good conscience. It is not material for present purposes that the information he obtained as to the law may have been incorrect. If the information he received was such as to appeal to the mind and conscience of an ordinary layman as being worthy of ac-

---

[1] In the year 1796, the act of 1704 was repealed and a new act came into effect as follows: "and be it enacted by the authority aforesaid, That every person who shall commit fornication, and be thereof convicted, shall be punished by the fine of fourteen dollars to be paid to the overseers of the poor of the township where the offence was committed, for the use of the poor of the said township." See the Laws of New Jersey by William Paterson, 1800 Edition, page 210. The Revised Statutes of N.J. 1877, Sec. 41, page 234 repeats the same language save only a change in the penalty involved.

ceptance it has competence here in an attempt to answer the question bearing on his moral fitness.

After he had made inquiries as above, he visited a Mr. Carlsen, a New Jersey attorney, and petitioner testified as to the advice given him as follows: "He thought the best way out of this was a Mexican divorce, and he gave me the address of a Mexican lawyer in New York and told me to go to him. * * * The final result was a Mexican divorce * * *." I find nothing in the foregoing which would indicate that petitioner is not of good moral character. Obviously, he was making a bona fide attempt to conduct himself within the law. But this is not all! An opinion issued by Attorney General David T. Wilentz of New Jersey was introduced in evidence, from which it appears that he has advised those who are authorized to issue marriage licenses as follows: "When a decree of divorce granted by a court of a foreign nation has been produced to a Registrar, he is under no duty to make further inquiry concerning the same, but should recognize it as valid." Thus, when petitioner produced his Mexican divorce for the purpose of obtaining a license to marry, the official issuing the same, for marriage purposes, was authorized to recognize the validity of the Mexican divorce and did in fact so recognize it in this case. Upon the presentation of the license to the magistrate who married petitioner to Evelyn M., the magistrate also acted within the sanction of the opinion. To hold that this petitioner is blighted with a bad moral character in thus conducting himself would make it difficult, indeed, not to find that the Attorney General, the licensing official, and the magistrate who aided in the consummation of the marriage contract, were not also of bad moral character.

In considering moral character it is not easy to draw a line between principles which fall in the sphere of the ecclesiastical law and those which are exclusively within the temporal sphere. Moreover, with our traditions and our Anglo-Saxon approach, it is difficult indeed to reason on ethics at all without entering into the sphere of Christian, or biblical ethics, since our laws are so permeated with what Blackstone refers to as the "Revealed Law," nor do I believe, where copulation is involved, a satisfactory study can be made in the absence of the Revealed Law. For present purposes we may go back to the subject of adultery, with its highest source in the Decalogue. We learn, from sacred literature, that there were two sets of Commandments engraved on stone at different times, and delivered to Moses and that in a fit of righteous indignation he did "brake" the first set at the base of Mount Sinai. We have minutes on the subject somewhat analogous to modern committee minutes. They are found in the Book of Exodus, from which it appears that Moses went up into the mountain a second time and was given a second set. It appears that insofar as adultery is concerned the two sets were identical, because the Lord said to Moses before he handed him the second set, " * * * I will write upon these tables the words that were in the first tables, which thou brakest." The point here is, that while adultery was mentioned, fornication was not dealt with either in the original or in the second set of tablets. That there was a distinction at that time would seem to appear from Exodus 22.16 dealing with the punishment for enticing "a maid that is not betrothed," from which I conclude that fornication was not, and is not today, considered as serious an offense as adultery. Nor does it always and under all circumstances, strike with great violence against the perpetrator's moral character, much depends upon the surrounding circumstances.

Assuming arguendo that the petitioner here is found to have fornicated within the meaning of the law, what of it, can this conclusion, in the realm of the law, be arrived at without carrying the blight of immorality with it? I think it can. The true character of a man is largely, if not entirely, hidden in the secret recesses of his mind. Only by his conduct and by his words are we able to obtain any evidence of it. Moreover, as we have seen the generally accepted rules of morality or ethics fluctuate in each era and the best we can do with the subject is to apply the generally accepted rules of our own day. The statutory words "good moral character" do not confine us to the ecclesiastical sphere nor yet to the temporal. We may enter

the philosophical wherein the two are mingled. See Encyc. Americana Vol. 10 "Ethics" 540 to 546.

■ At the base of the petitioner's difficulty lies the subject of divorce, fraught as it is with great confusion and uncertainty in these United States and almost totally lacking in unanimity among them. Through it all is woven the ecclesiastical strands of a sacrament and as well the temporal strands of a contract. Looking then to the character of the man, it is noted that he has been governed by a natural desire for the marital relation not altogether from the sex urge but from the yearnings for a home life. These honorable, impelling motives did not carry him so far however, as to desire to fly in the face of the social amenities nor to knowingly consent to a conflict with the law. Evidence of this is found in his resort to legal advice where he would be advised not only as to the law but also as to the implications of a Mexican divorce. It appears that he acted on the advice of counsel and whether or not his counsel was in error on the close points involved, he was himself satisfied from the advice received that he was free to proceed as he did. Before one can be said to be of immoral character, a wrongful intent must be found. I find no intent in this petitioner either to violate the law or to violate a moral precept.[2]

The prayer of the petition is granted.

---

[2] To the same effect see unpublished opinion of Judge Walker of this court filed December 31, 1941, D.C., 71 F. Supp. 967, and also opinion in Petition of R———, D.C., 56 F.Supp. 969.

Since preparing this opinion, Petitions of Rudder et al., 159 F.2d 695, has come down from the 2nd Circuit and is more far reaching than the opinion here.