Robert Ernst **DICKHOFF**, Plaintiff,

v.

Edward J. **SHAUGHNESSY**, District Director of the Immigration and Naturalization Service at the Port of New York, Defendant.

United States District Court
S. D. New York.
May 24, 1956.

Blanch Freedman and Gloria Agrin, New York City, for plaintiff.

Paul W. Williams, U. S. Atty., Southern Dist. of New York, New York City, Burton S. Sherman, Sp. Asst. U. S. Atty., New York City, Harold J. Raby, Asst. U. S. Atty., New York City, Roy Babitt, Attorney, Immigration and Naturalization Service, New York City, of counsel, for defendant.

DIMOCK, District Judge.

Plaintiff, an alien resident, brings this action to set aside an order of deportation against him. He seeks an injunction to prevent defendant from deporting him until final determination of the action. Defendant cross-moves for summary judgment, alleging that only issues of law are involved.

Plaintiff concedes that he entered the United States illegally in 1927. For this reason, plaintiff was declared deportable by the Board of Immigration Appeals on November 17, 1949. The Board stayed deportation, however, and granted him the right to voluntary departure and readmission under the so-called seventh proviso of § 3 of the Immigration Act of 1917, 39 Stat. 878.* When plaintiff failed to avail himself of this privilege during the period set by the Board, the order of deportation attacked in this action was entered.

During the administrative proceedings that led up to the deportation order plaintiff twice applied for a suspension of deportation, first under § 19(c) of the Immigration Act of 1917, as amended, 54 Stat. 672, and then under § 244(a)(5) of the Immigration Act of 1952, 8 U.S.C. § 1254(a)(5). Under each of these Acts, the Attorney General is granted discretionary authority to suspend deportation under stated conditions. The Attorney General entertained both applications for suspension of deportation. The effect of this was that plaintiff would be statutorily eligible for that relief if he could bring himself within the qualifications prescribed either by the 1917 Act or the 1952 Act. See N.Y.U. Conference on Immigration and Nationality Act

134–35 (1954). The Attorney General, however, denied both applications on the ground that under neither Act was plaintiff statutorily eligible for suspension of deportation. In this action, plaintiff seeks to review both denials. If the Attorney General was incorrect in his finding that plaintiff was not statutorily eligible for suspension of deportation under either the 1917 or 1952 Act, the order of deportation would be invalid, since the Attorney General had failed to exercise the discretion reposed in him, and defendant could not be awarded summary judgment. In determining this matter, I shall consider plaintiff's application under each Act separately.

*I. 1917 Act.*

The Immigration Act of 1917, as amended, 54 Stat. 672, gives the Attorney General discretionary authority to suspend deportation. This relief, however, by statutory reference to 40 Stat. 1012, is withheld from any alien who has been a member of "any organization that entertains a belief in, teaches, or advocates the overthrow by force or violence of the Government of the United States". Plaintiff admits that, for a period of one year in 1929 or 1930, he was technically a member of the Communist Party. The Attorney General therefore held plaintiff statutorily ineligible for suspension of deportation.

Plaintiff argues that he was merely a nominal member of the Communist Party for a short period and therefore not precluded from obtaining suspension of deportation. In this contention, he relies solely on Galvan v. Press, 347 U.S. 522, 74 S.Ct. 737, 741, 98 L.Ed. 911. There the Supreme Court quoted a statement in Colyer v. Skeffington, D.C.D. Mass., 265 F. 17, 72, which had been inserted in the Congressional Record by Senator McCarran, sponsor of the bill. That statement, which the Supreme Court considered as "a weighty gloss" to show what Congress intended, was that:

* Now 8 U.S.C. § 1182(c).

" 'Congress could not have intended to authorize the wholesale deportation of aliens who, accidentally, artificially, or unconsciously in appearance only, are found to be members of or affiliated with an organization of whose platform and purposes they have no real knowledge.' "

After thereby excluding from the definition of "member" those who unknowingly joined the Communist Party, the Supreme Court set down the rule to determine who was included within the term "member":

"It must be concluded, therefore, that support, or even demonstrated knowledge, of the Communist Party's advocacy of violence was not intended to be a prerequisite to deportation. It is enough that the alien joined the Party, aware that he was joining an organization known as the Communist Party which operates as a distinct and active political organization, and that he did so of his own free will." 347 U.S. at page 528, 74 S.Ct. at page 741.

As the Supreme Court stated in the Galvan case, where they held that alien deportable, this legislative prescription must be followed "however severe the consequences and whatever view one may have of the wisdom of the means which Congress employed". 347 U.S. at page 528, 74 S.Ct. at page 741.

Plaintiff's membership in the Communist Party was more than merely accidental. Plaintiff's interrogation before the Immigration and Naturalization Service reveals that he knew full well that he was joining the Communist Party. He stated specifically that he joined in order "to find out for myself what is this all about, this Communism." (p. 32.) He received a membership book in the Communist Party (p. 31), and paid dues at infrequent intervals (p. 40). Before he joined he attended four meetings of the Communist Party at which he listened to speeches on Communism (p. 33). He knew when he joined that the Communist Party had caused a rev-olution in Russia and had tried to cause a revolution in Germany (p. 48). After joining, he attended five more meetings (p. 162), at which he received indoctrination on the possible necessity of taking over this country by revolution (pp. 33, 35, 36). He states that ideological differences developed between himself and the Party "very soon" (p. 40), but he did not resign until one year after joining ·(p. 39). He resigned, he alleges, because of these differences and because the Communist Party did not afford him the "spiritual uplift" that he wanted (p. 38).

■ It is therefore clear that plaintiff knowingly joined the Communist Party. I have no reason to doubt that, after his short period of membership, he severed all ties with it and is today firm in his renunciation, but, under the 1917 Immigration Act, activity subsequent to membership is irrelevant. No matter how Anti-Communist the alien may now be, the fact that he once knowingly joined the Communist Party makes him statutorily ineligible for suspension of deportation.

*II. 1952 Act.*

Realizing the inequity of this "once a member, always deportable" theory, Congress, in the 1952 Act, provided that an alien who has completely withdrawn from the Communist Party is eligible for suspension of deportation. The Attorney General denied plaintiff's application under the 1952 Act, however, on the ground that plaintiff, under the statute, could not be found to be a person of good moral character. This finding is required before an alien is eligible for suspension of deportation. 8 U.S.C. § 1254(a)(5).

Defendant assigns plaintiff's marital status as the stumbling block to a finding of good moral character. Plaintiff married one Rose Covello in 1928 and two children have been born of this marriage. In 1944 they separated and in 1946 plaintiff obtained a Mexican divorce. Neither plaintiff nor his wife went to Mexico to obtain the divorce. Plaintiff was represented by a Mexican

lawyer. His wife was served with notice of the action but did nothing to oppose the divorce. On March 30, 1947, plaintiff married his present wife in New Jersey. They have since been cohabiting in New York and have three children by this marriage.

Defendant argues that plaintiff is now living in adultery since his Mexican divorce was void and, therefore, his second marriage was void. Under the 1952 Immigration Act, 8 U.S.C. § 1101(f), no person "who * * * has committed adultery" may be regarded as a person of good moral character. This, defendant states, makes plaintiff statutorily ineligible for suspension of deportation.

This provision excluding "one who * * * has committed adultery" from the ranks of the possessors of good moral character is not easy of application. In this district alone, I have found four cases which turned on its interpretation. Of those four, two held that the commission of technical adultery precludes good moral character. Petitions for Naturalization of F— G— and E— E— G—, D.C.S.D.N.Y., 137 F.Supp. 782; Petition of Matura, D.C.S.D.N.Y., 142 F.Supp. 749. The other two held that technical adultery was not a statutory bar to a finding of good moral character. Petition of Greenidge, D.C.S.D.N.Y., (unreported May 2, 1955); Petition of Racine, D.C.S.D.N.Y., (unreported May 9, 1955).

All four of these cases involved petitions for naturalization where the consequences of disqualification for technical adultery are much less serious than where deportation is threatened. Fong Haw Tan v. Phelan, 333 U.S. 6, 10, 68 S.Ct. 374, 92 L.Ed. 433. Nevertheless we cannot have one interpretation of the same statutory provision when naturalization is involved and another when deportation is involved. If the literal construction is so harsh that we cannot believe that Congress intended us to apply it in deportation cases, the fact that we would not have reached that conclusion if only naturalization cases were affected by it is immaterial.

In view of this disagreement among the judges of this court, and lacking any appellate court interpretation of this declaration in the 1952 Act that no person who has committed adultery may be regarded as a person of good moral character, it is necessary for me to reach my own conclusion instead of following authority.

### A. Congressional History.

The Congressional history of the 1952 Act does not throw much light on the question. The 1917 Act, as amended, 54 Stat. 672, contained a provision requiring good moral character as a qualification for suspension of deportation but no specific statement excluding those guilty of adultery from the class of possessors of good moral character. The original bill adopted by the House of Representatives, H.R. 5678, continued the "good moral character" provision just as it was in the 1917 Act and, like it, contained no declaration as to the relation between adultery and good moral character. The Senate bill, S. 2550, included the declaration with which we are dealing and it was accepted in the conference report. See H.R.Rep.No.2096, 82d Cong., 2d Sess. 128 (1952).

### 1. In the Senate.

There is a great dearth of reference to this clause in the volumes of reports and debate on the Immigration Act. The Senate Judiciary Committee, in reporting the bill, stated:

"Section 101(f) [8 U.S.C. § 1101 (f)], while not defining the term 'good moral character,' provides standards as an aid for determining whether a person is one of good moral character within the meaning of those provisions of the bill which require that good moral character be established for certain periods in connection with a person's eligibility for certain benefits. By providing who shall not be regarded as a person of good moral character, it is

believed that a greater degree of uniformity will be obtained in the application of the 'good moral character' tests under the provisions of the bill." Sen.Rep.No.1137, 82d Cong., 2d Sess. 6 (1952).

Senator McCarran, Chairman of the Judiciary Committee and sponsor of this bill which continued the old law's provision as to good moral character and added the exclusion of those guilty of adultery, in speaking of provisions of the old law carried into his bill, stated:

> "there has been built up a body of judicial and administrative interpretation of those provisions upon which we can rely." 98 Cong.Rec. 5089.

Aside from one repetition of the same statement that appeared in the Senate Report, see 98 Cong.Rec. 7016, this is the full discussion in the Senate of the "good moral character" clause. Thus we have, basically, a desire for uniformity and continued reliance on past judicial interpretations.

There is no doubt that under past judicial interpretations technical adultery would not be considered as precluding a finding of good moral character. See, e. g., Petitions of Rudder, 2 Cir., 159 F. 2d 695. The Government has argued, however, that, since Congress intended to obtain uniformity by enacting this provision, it must have meant that even technical adultery should be a bar to a finding of good moral character since uniformity could only be reached by such an interpretation. Assuming that uniformity is not obtained when in all cases technical adultery is not considered a bar to a finding of good moral character (an assumption I am not prepared to accept), the Government's contention still must fail. The facts of this case, as reported in the opinion of the Board of Immigration Appeals, prove the fallacy of the Government's contention regarding uniformity. Plaintiff accomplished his second marriage in New Jersey. If he had then remained in New Jersey he would not have committed adultery. New Jersey retains the old common law doctrine that extra-marital sexual intercourse does not constitute adultery unless the female participant is married. Petition of Smith, D.C.D. N.J., 71 F.Supp. 968, citing State v. Lash, 16 N.J.L. 380. Since plaintiff's second wife had not been previously married, plaintiff would not have been guilty of adultery in New Jersey. However, as fate would have it, plaintiff did not remain in New Jersey but lived in New York. New York Penal Law, Consol. Laws, c. 40, § 100 defines adultery as "sexual intercourse of two persons, either of whom is married to a third person." Assuming that a literal interpretation of this section is correct, plaintiff, in New York, has committed adultery.

Thus an alien situated like plaintiff who stayed in New Jersey would be eligible for suspension of deportation but one who moved to New York would not be. How this can be called "uniformity" I do not comprehend.

### 2. House of Representatives.

Most of the debate in the House took place prior to the insertion in the bill of the declaration as to the relation of adultery and good moral character. While, therefore, the House, in the reports and discussion, did not have before it this clause, nevertheless the comments made before its insertion may shed light on what the House thought it was accomplishing by adopting this Act.

Congressman Walter, Chairman of the House Judiciary Committee, and sponsor of the House immigration bill, in answer to critics who attacked the bill because it limited the availability of suspension of deportation, stated:

> "The fact of the matter is, the discretionary power of the Attorney General [to suspend deportation] is enlarged under the provisions of this bill rather than limited." 98 Cong.Rec. 4302.

Congressman Graham, another member of the House Judiciary Committee and proponent of this bill, was asked whether the proposed bill changed any

of the definitions that had become part of the immigration law. He answered:

"It restates the former definitions in accordance with existing law and the most recent decisions of the Supreme Court of the United States." 98 Cong.Rec. 4303.

These were the only two statements made by proponents of the bill in the House which could be said to express their intention relative to the "good moral character" clause and its effect on suspension of deportation. In addition, one other House comment, on an analogous part of the bill, should be considered. In discussing the clause relative to deportation for criminal offenses, the House managers, at the Conference to iron out differences between the bills of the two houses of Congress, said:

"In composing the differences between the Senate and House versions, the conferees have refined the language so as to make it emphatically clear that the Attorney General *may not * * * capriciously deport an alien solely on the basis of inconsequential, unwitting infraction of the law.*" H.Rep.No.2096, 82d Cong. 2d Sess. 127. (Emphasis added.)

█ Summarizing this scanty history in the House, three principles are found: (1) increase the Attorney General's discretionary authority to suspend deportations; (2) retain definitions propounded in the case law; and (3) prevent deportation for unwitting infractions of the law. Not one of these three principles would be achieved if I accepted defendant's contention.

*B. The provision, 8 U.S.C. § 1101(f), itself:*

A study of the wording of the "good moral character" provision, itself, af-

fords some help. The clause, 8 U.S.C. § 1101(f), commences with:

"No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was—"

and then specifies thirteen separate grounds. These grounds may be divided into two general categories: (a) those in which a conviction must be obtained; and (b) those in which no conviction is necessary. Omitting the adultery ground which is involved in this case, there are eight grounds within the second category: (1) an habitual drunkard; (2) one whose income is principally derived from illegal gambling activities; (3) one who has given false testimony for the purpose of obtaining benefits under the Act; (4) one who practices polygamy; (5) one who is engaged in prostitution; (6) one who knowingly helps another to enter this country illegally; (7) one who admits having committed a crime involving moral turpitude;[1] and (8) one who is an "illicit trafficker" in narcotics.[2]

Analyzing these eight grounds where no conviction is required, it is clear that two specifically require a finding of wilful intent and all of the others consist of acts of such character that the alien who commits them must know that he is doing so and that they are condemned by the general moral feelings of the community. None bear any resemblance to the act of an alien who has obtained a divorce not recognized in the United States and remarried.

Thus, lacking proof of a conviction, the adultery ground is the only one which precludes suspension of deportation where knowledge of the proscribed activity is not required. Only one schooled

---

1. This ground, found at 8 U.S.C. § 1182(a) (9), is stated to be sufficient if there is either a conviction or an admission. It must, therefore, be included in both the "conviction" and "nonconviction" categories.

2. This ground, found at 8 U.S.C. § 1182 (a) (23), also is included in both categories because of the wording of that section.

in the law could be said to know that plaintiff was technically committing adultery in living with a woman he considered his wife and who was the mother of his three children. Moreover, as the Assistant Commissioner of Immigration said in a decision dated June 10, 1949:

"Without passing upon the legal points involved in the Mexican divorce decree, we believe that the respondent [this plaintiff] entered into his second marriage in good faith, and that we would not be justified in impugning his character because of the construction which the courts may place upon the validity of the divorce proceedings in Mexico."

*C. Previous Case Law:*

A finding of good moral character was required for suspension of deportation under the 1917 Act as well as under the 1952 Act. Under the former Act, however, there were no declarations as to certain acts the commission of which precluded a finding of good moral character; it was left completely to the administrative departments and, on review, to the courts. Under that case law, one who wilfully and openly commenced and continued an adulterous relationship, without extenuating circumstance, would not obtain a finding of good moral character. See, e. g., Johnson v. United States, 2 Cir., 186 F.2d 588, 22 A.L.R.2d 240.

On the other hand, where the "so-called" adulterous relationship was accompanied by extenuating circumstances and resulted in a faithful, stable and long-continuing family relationship, the parties were not excluded from the possessors of good moral character. See, e. g., Petitions of Rudder, 2 Cir., 159 F.2d 695. As there stated by Swan, C. J.:

"The trend of recent * * * decisions is to stress stability and faithfulness in the 'marital' relationship rather than the mere legality of ties, which everyone knows may so easily be severed if the parties have the financial resources to obtain a Reno divorce." 159 F.2d at page 697.

Defendant argues that these cases are no longer good law because adultery is specifically mentioned in § 1101(f). But that argument is based on the assumption that Congress meant to change the case-law definition of adultery as it related to good moral character. For the reasons earlier discussed, I find it difficult to accept such an assumption.

Moreover, there is some doubt that plaintiff can be said to be guilty of committing adultery. An opinion by former Judge Rifkind in Petition of Schlau, D.C.S.D.N.Y., 41 F.Supp. 161, 162, affirmed on this ground, but reversed on other grounds, 2 Cir., 136 F.2d 480, is very much in point. The alien in that case had obtained a Rabbinical divorce. Unaware that the divorce had no civil effect, he remarried. Judge Rifkind questioned whether that alien was guilty of adultery:

"We * * * regard adultery as a ground for exclusion * * * because it is a crime, and the commission of crime usually connotes lack of moral character. But this petitioner has not been convicted of a crime. 'The crime of adultery cannot be committed without a criminal intent * * *.' 2 C.J.S., Adultery, § 7, p. 476; State v. Audette, 81 Vt. 400, 70 A. 833, 18 L.R.A.,N.S., 527, 130 Am.St.Rep. 1061.

"How likely is it that any grand jury would indict petitioner on the basis of the facts herein recited? Assuming the improbability that an indictment were found, how likely is it that a petit jury would convict him?"

I believe Judge Rifkind's words are equally applicable to this plaintiff.

*D. Conclusion.*

██  The Government's argument stands or falls on two contentions: (1) that adultery is defined to mean any sexual relations by one technically married with another who, in law, is not that

person's spouse; and (2) that all such cases must fall within § 1101(f)(2), thereby making the alien involved statutorily ineligible for suspension of deportation.

In Galvan v. Press, 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911, which I discussed in the first portion of this opinion, the Supreme Court had before it a similar question of statutory interpretation. The Immigration Act of 1917 declared that any alien who had been a "member" of the Communist Party was statutorily ineligible for suspension of deportation. A literal construction of the word "member" would seem to require, if we follow the Government's contention in this case, that any alien who joined the Communist Party was, per se, ineligible for suspension of deportation, but that is not what the Supreme Court said. Paraphrasing the Supreme Court's excerpt from Colyer v. Skeffington, D.C., 265 F. 17, 72, quoted above, to relate it to this case, we obtain the following:

> Congress could not have intended to authorize the wholesale deportation of aliens who, accidentally, artificially, unknowingly, or unconsciously in appearance only, are found to have technically committed adultery.

■■ Defendant's motion for summary judgment is therefore denied. While plaintiff has not cross-moved for summary judgment, such a formal motion is not necessary where no issue of fact is in dispute. 6 Moore, Federal Practice, par. 56.12. I grant plaintiff summary judgment. The deportation order, dated March 2, 1956, is hereby declared invalid and defendant is enjoined from taking any step to execute it. Plaintiff is statutorily eligible for suspension of deportation under 8 U.S.C. § 1254(a)(5). This matter is remanded so that the Attorney General may exercise his discretion pursuant to that section. Acosta v. Landon, D.C.S.D.Cal., 125 F.Supp. 434.

Settle order on notice.