In re Petitions for Naturalization of
R_____ E_____ and
A_____ E_____.

Nos. 205, 206.

United States District Court
S. D. Illinois, N. D.

Oct. 1, 1968.

---

OPINION OF COURT UPON RECOM-
MENDATIONS OF NATURAL-
IZATION EXAMINER

ROBERT D. MORGAN, District
Judge.

The Examiner's findings of fact in
these two cases, both formal and infor-
mal, are parallel insofar as the issues
presented are concerned. They are not
contested and are adopted by the Court,
except as the contrary is hereinafter
clearly shown in relation to findings of
"adultery."

The facts show that petitioners have
been husband and wife since October 31,
1966; but that they have lived together
as husband and wife since 1947 and have
three children, now aged 19, 17 and 8,
who have lived with them since birth and
are dependent upon them. Petitioners
were admitted to the United States for
permanent residence in 1958, and ap-
parently since have maintained a normal
and responsible home and family, with
no outward appearance of legal defect.

Both petitioners had prior unsuccess-
ful marriages. Mrs. E_____ was mar-
ried in Australia in late 1946, but there
was a permanent separation after a few
months and she returned to England in
February, 1947. That marriage was
ended by divorce on February 3, 1948.
Since 1944 Mr. E_____ has not lived
with the wife he married in 1941. They
separated by agreement, in England, and
he contributed to the support of a son
of that marriage through the son's
minority. Though Mr. E_____ often
suggested it to his first wife, he was not
divorced until October 13, 1966, when
she finally obtained a divorce against

him in England, where she had lived continuously. Petitioners were married within the month after that divorce and thus rendered their children clearly legitimate under Illinois law (Ch. 3, Ill. Rev.Stat. § 12) and fully legalized the stable family they had really established almost twenty years earlier.

It is thus apparent that for about the first eighteen of the past twenty-one years, while petitioners lived together and were raising this family, the "husband" also had a wife in England. This included about four of the five years prior to filing both petitions for naturalization on May 25, 1967. It is equally apparent that this was not generally known. The Examiner states conclusions of law that both petitioners here "committed adultery" during the critical period but that both have established the requisite good moral character.

Section 316(a) of the Immigration and Nationality Act (8 U.S.C. § 1427) provides:

"No person, except as otherwise provided in this title, shall be naturalized unless such petitioner * * * has resided continuously, after being lawfully admitted for permanent residence, within the United States for at least five years * * * and (3) during all the periods referred to in this subsection has been and still is a person of good moral character * * *."

Section 101(f) (2) of the Immigration and Nationality Act (8 U.S.C. § 1101(f) (2) provides:

"No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was * * * (2) one who during such period has committed adultery * * *."

Federal law does not define adultery. This latter specific prohibition, however, came into the Federal statute with the 1952 Act. Prior to that the courts in a case such as this, involving a stable family with some possible adultery based on a prior marriage which was in existence only as a matter of law, had little difficulty in finding good moral character in spite of such "adultery." See Petitions of Rudder, 159 F.2d 695 (2nd Cir. 1947).

Since the 1952 Act, however, we have the view of the so-called "Mother Court," that under the statute there is simply no room for extenuating circumstances or judicial discretion, Petition for Naturalization of O——— N———, 233 F.Supp. 504 (S.D.N.Y.1964) and In re Zunker, 283 F.Supp. 793 (S.D.N.Y. 1968). We also have what might thus far be called the midwestern and western view which, while finding what clearly would be called adultery in the New York cases, refuses to interpret the statute or to find congressional intent to prevent naturalization (or support a deportation order) under the other circumstances found which are favorable to good moral character. Wadman v. Immigration and Naturalization Service, 329 F.2d 812 (9th Cir. 1964); In re Briedis, 238 F.Supp. 149 (N.D.Ill.1965); and In re Edgar, 253 F.Supp. 951 (E.D. Mich.1966). In the latter case the Court even concluded that adultery had been committed under the Michigan statute. These views are in direct conflict and would quite obviously lead to opposite results in both cases at bar.

Once there is a sound conclusion that adultery has been "committed" within the period involved, it is most difficult to argue with the reasoning of the Southern District of New York cases (supra). The language of Section 101 (f) (2) seems crystal clear in that respect. Therefore, the question here appears to be one of law: Have petitioners "committed adultery" within the meaning of the Immigration and Nationality Act? This Court does not believe that they have.

It is generally assumed that, in adopting Section 101(f) of the 1952 Act, Congress sought to make more uniform nationally the determinations of good moral character in naturalization cases. That it has not succeeded, at least with

respect to Section 101(f) (2), is indicated by the opposing cases cited above. That it cannot achieve uniformity on this point without a Congressional definition of adultery or a controlling definition thereof by the Supreme Court seems equally apparent.

In the absence of a controlling definition, it is difficult to see how a court or a Naturalization Examiner can conclude that a person has not committed adultery if the facts clearly show violation of an applicable state criminal statute on the subject. Certainly state conviction of the crime of adultery would seem to be conclusive of the issue; but conviction can hardly be considered a prerequisite on the naturalization question of good moral character, if the facts are clear. Violation of a state criminal statute in a manner which the Federal Act says shall preclude finding of good moral character can hardly be squared with such a finding without simply ignoring the Federal proscription. This is the situation under the New York State statute.

On the other hand, it seems equally clear that, without finding violation of a statute on the subject or some controlling definition, a Naturalization Examiner, or a court reviewing his findings, presumes a great deal to find that a petitioner has committed adultery in circumstances such as are here present. While the word adultery may be thought to be commonly understood, the legal requirements for its commission vary widely and definitions are far from uniform. See 2 C.J.S. Adultery §§ 1 thru 29, p. 471, and Bouvier's Law Dictionary, Rawle's Third Revision, pp. 149–151.

Without knowledge of what definition of adultery Congress had in mind, it seems certain that some legal definition was intended, as opposed to several possible ecclesiastical definitions. No principle of law is known which would require the most stringent possible definition in such circumstances. The most liberal is generally more acceptable where the problem is technical. A similar problem can exist with the word "marriage" which is involved in adultery. Persons can be legally married or divorced in some jurisdictions under circumstances not sanctioned in others. The intertwining of legal, moral and religious principles and beliefs in these matters inevitably affect pronouncements with respect thereto.

It does not seem reasonable to conclude that Congress really intended to require a finding that persons had committed adultery when their action was not violative of the criminal law on that subject in the state of their residence. There seems clearly no violation here of the criminal statute of Illinois.

Section 11–7 of Chapter 38 of the Illinois Revised Statutes provides:

"(a) Any person who cohabits or has sexual intercourse with another not his spouse commits adultery, *if the behavior is open and notorious,* and (1) The person is married and the other person involved in such intercourse is not his spouse; or (2) The person is not married and knows that the other person involved in such intercourse is married." (Emphasis added.)

This is from the new Criminal Code of Illinois, adopted in 1961. Prior to that time the Illinois law was as discussed in the *Briedis* case (supra). With respect to Article 11 of the new Code on Sex Offenses (of which the foregoing section is a part), the distinguished committee which drafted the Code comments:

"The broad scope of personal, family, community, social and religious interests which can be affected by sexual activities renders more difficult the problem of drafting legislation proscribing specific acts of sexual conduct. The Committee approached the problem from several basic premises: (1) protection of the individual against forcible acts; (2) protection of the young and immature from the sexual advances of older and more mature individuals; (3) protection of the public from open and notorious con-

duct which disturbs the peace, tends to promote breaches of the peace, or openly flouts accepted standards of morality in the community; and (4) protection of the institution of marriage and normal family relationships from sexual conduct which tends to destroy them. It will be noted that the key interests sought to be protected are freedom from force for everyone; freedom from the unfair exploitation of youth before they are mature enough to make valid individual judgments; freedom of the public from "open and notorious" acts; and the community's interest in preserving the monogamous marriage and family institution which is the current basis of our social and moral structure. The Committee considers the protection of these interests sufficiently vital to warrant criminal sanctions for their violation.

"The Article is not intended to proscribe any sexual conduct between consenting adults unless such conduct adversely affects one of the key interests sought to be protected."

With respect to the words "open and notorious" in the Adultery section above (Ch. 38, Ill.Rev.Stat. § 11–7), the Committee comments further:

"Since it is the scandalousness, the affront to public decency and the marital institution that is of pivotal concern in this crime, notoriety must extend not only to the sexual intercourse or cohabitation, but must also extend to the fact of the absence of the marital relationship between parties engaging in such behavior."

■ There was nothing open and notorious about any possible wrongful conduct here. In view of the Illinois statutory definition since 1961, and the clearly stated legislative intent behind it, this Court simply cannot conclude that petitioners here committed adultery, at least during the five years preceding their petitions in 1967.

■ The fact that the divorce in England may have been granted on the ground of adultery deserves comment. The fact in that regard is not clear as desertion was also charged. Even if so, however, there appears no requirement for giving credit to such a determination in an uncontested proceeding in another country. It has no bearing on the real issue here.

It is recognized that the Board of Immigration Appeals and the Immigration and Naturalization Service have taken the position that adultery is committed even though the conduct is not punishable criminally, but would be considered to provide basis for divorce on the ground of adultery under state law. That may be factually reasonable in most cases where a divorce has been granted on the ground of adultery; but as a proposition of general application this court does not consider it sound. The public policy considerations may be entirely different for determining whether a marriage should be dissolved and for determining good moral character for citizenship. Such considerations seem vastly different in these present cases. Surely the same test should be applicable to both petitioners in this family.

It is conceded that in these cases, if the conduct does not constitute criminal adultery, the bar of 8 U.S.C. § 1101(f) (2) does not apply to the female petitioner. However, to say that she has the requisite good moral character for naturalization and her husband does not, in the light of all the circumstances here, would seem so ridiculous as to demonstrate the error of the proposition.

■ This Court agrees with the Court of Appeals for the Ninth Circuit in the *Wadman* case, supra, that "Since adultery here is relevant as a test of good moral character, a definition of the offense in the abstract will hardly suffice," (329 F. 2d 812 at p. 816). It is the considered judgment of this Court that the definition in the criminal law of the state involved must control in the absence of specific circumstances relating the questioned conduct to accepted standards of good moral character. To all intents and

purposes, and by reputation, these petitioners were both fully responsible married people and good parents of their children. It is simply not reasonable to find that they, or either of them, have committed a serious moral offense against society or their former mates.

Accordingly, the Court accepts the recommmendations of the Examiner that both petitions herein be granted, upon completion of any other requirements, including the oath at the appropriate time. The Court joins in the conclusions of law that both petitioners be regarded as persons of good moral character during the statutory period. The Court rejects the conclusion in both cases that the petitioner has committed adultery within the meaning of Section 101(f) (2) of the Immigration and Nationality Act (8 U. S.C. § 1101(f) (2).

An appropriate order may be presented.