Rafael Antonio BREA–GARCIA,
Petitioner,

v.

IMMIGRATION AND NATURALIZA-
TION SERVICE (by its District Director
at Newark, New Jersey), Respondent.

No. 75–1599.

United States Court of Appeals,
Third Circuit.

Argued Dec. 10, 1975.

Decided Feb. 25, 1976.

As Amended March 12, 1976.

Raul F. Tous, Newark, N. J., Antonio C. Martinez, New York City, for petitioner.

B. Franklin Taylor, Jr., Acting Chief, James P. Morris, Chester J. Halicki, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before SEITZ, Chief Judge, GIBBONS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

Rafael Antonio Brea-Garcia, a deportable alien, seeks review of the denial of his application for voluntary departure on the ground that he had committed adultery and was therefore not of good moral character. Section 244(e) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1254(e) (1971) [1] allows the Attorney General to permit an alien subject to deportation proceedings to depart from this country voluntarily if the alien establishes that he has been a "person of good moral character" for at least five years before his application. "Good moral character" is not defined, except negatively in section 101(f), 8 U.S.C. § 1101(f) (1971), which lists classes of persons who shall not be regarded as having good moral character.

One such class includes anyone who "has committed adultery." [2] The term "adultery" is nowhere defined in the Act. That lack of definition is the crux of this petition for review. Brea-Garcia contends that a proper definition of adultery would not encompass his conduct so that he should be eligible to seek permission to depart voluntarily. We disagree and affirm the decision of the Board of Immigration Appeals.

## I.

Brea-Garcia is a citizen of the Dominican Republic. His first wife, also a Dominican citizen, preceded him to the United States as a legal resident alien. Brea-Garcia, however, entered as a nonimmigrant student with permission to remain for about three years.

During the two and a half years he was living with his first wife in New Jersey, Brea-Garcia became sexually intimate with the woman to whom he is now married and fathered a child by her. Eventually, he left his wife and moved in with the other woman. His wife returned to the Dominican Republic and obtained a divorce on grounds of incompatibility. Although Brea-Garcia was then free to marry his paramour, he did not do so, and a second child was consequently born out of wedlock.

At about the time of the divorce, the Immigration and Naturalization Service instituted proceedings to deport Brea-Garcia for staying in the country beyond the permitted period. He did not contest his deportability but applied for permission to depart voluntarily under section 244(e) of the Immigration and Nationality Act.

The immigration judge found that Brea-Garcia's conduct constituted adultery for purposes of section 101(f)(2), and that he was thereby precluded from showing good moral character required for consideration

---

1. 8 U.S.C. § 1254(e) (1971) provides in pertinent part:

    The Attorney General may, in his discretion, permit any alien under deportation proceedings . . . to depart voluntarily from the United States at his own expense in lieu of deportation if such alien shall establish to the satisfaction of the Attorney General that he is, and has been, a person of good moral character for at least five years immediately preceding his application for voluntary departure under this subsection.

    Voluntary departure allows an alien to escape the stigma of deportation, select his own destination, and enhances the possibility of return to the United States. *Strantzalis v. INS*, 465 F.2d 1016, 1017 (3d Cir. 1972) (per curiam).

2. 8 U.S.C. § 1101(f) provides in pertinent part:

    For the purposes of this chapter—
    No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was—

    \*     \*     \*     \*     \*     \*

    (2) one who during such period has committed adultery   .   .   . .

of his application. Therefore, the immigration judge denied the application and entered a deportation order. Brea-Garcia appealed to the Board of Immigration Appeals.

While his appeal was pending, Brea-Garcia married the woman with whom he had been found to have committed adultery. Upon dismissal of his appeal by the Board of Immigration Appeals, he moved to re-open the proceedings in light of his marriage. The case, accordingly, was remanded to the immigration judge for further hearing and a new order.

Despite the marriage, the immigration judge stated that he had "no choice but to re-enter an order of deportation" because of Brea-Garcia's adultery within the past five years. He observed that marriage to the present wife was delayed apparently so she could first obtain a visa as the unmarried child of a legal resident parent even though the delay resulted in a second birth out of wedlock. Thus, he concluded, the subsequent marriage should not operate as a remission of the adultery which had evidently destroyed Brea-Garcia's first marriage.

The Board of Immigration Appeals affirmed the decision and dismissed the appeal. Brea-Garcia next sought review in this court, pursuant to section 106(a) of the Immigration and Nationality Act, 8 U.S.C. § 1105a(a) (1971).

## II.

At the outset, we note that we are not here asked to overrule a discretionary administrative decision to deny voluntary departure as we were in *Strantzalis v. INS*, 465 F.2d 1016 (3d Cir. 1972), where the alien was statutorily eligible but was nonetheless denied voluntary departure. *See also United States ex rel. Hintopoulos v. Shaughnes-*

sy, 353 U.S. 72, 77, 77 S.Ct. 618, 1 L.Ed.2d 652 (1957). In the instant case, the application was not even considered on the merits because the prerequisite of section 244(e) was deemed not satisfied. We must, therefore, determine whether the immigration judge erred as a matter of law in his construction of the statutory requirement as modified by section 101(f)(2).

Brea-Garcia's argument in this court is basically two-fold: (1) "adultery" for section 101(f)(2) should be defined with reference to the criminal, rather than civil, law of the state where the conduct occurred,[3] and (2) a federal definition should then be superimposed on the state definition in order to insure minimal uniformity in the administration of federal immigration laws.

If his conduct were measured against New Jersey's criminal law, Brea-Garcia would not be guilty of adultery. New Jersey is among the few states which retain the common law definition of criminal adultery as extramarital sexual intercourse in which the female participant is married.[4] *Dickhoff v. Shaughnessy*, 142 F.Supp. 535, 539 (S.D.N.Y.1956); *Petition of Smith*, 71 F.Supp. 968, 970 (D.N.J.1947); *State v. Lash*, 16 N.J.L. 380 (1838).

As a ground for divorce, however, adultery under 2A N.J.S.A. 34–2 (1952) has been defined as "voluntary sexual intercourse of a married person with one not the husband or wife of that person." *Johnson v. Johnson*, 78 N.J.Eq. 507, 80 A. 119, 120 (Ch.N.J. 1911). Thus, use of the New Jersey civil definition of adultery would sweep Brea-Garcia's conduct within the reach of section 101(f)(2).

We are constrained to hold that, in the absence of a federal definition of adultery, section 101(f)(2) must be construed with reference to state civil law. An examination of the classes which are deemed to

---

**3.** He cites decisions from a few courts which have applied state criminal law. *Moon Ho Kim v. INS*, 514 F.2d 179 (D.C. Cir. 1975); *In re Petition of R— E—, 290 F.Supp. 281 (S.D.Ill. 1968)*; In re Johnson, *292 F.Supp. 381 (E.D.N. Y.1968)*. See also Talavera v. Pederson, *334 F.2d 52, 57 (6th Cir. 1964)*.

**4.** The New Jersey statute setting forth the punishment for adultery does not define the offense. 2A N.J.S.A. 88–1 (1969) merely provides:

Any person who commits adultery is guilty of a misdemeanor.

lack good moral character reveals that Congress used the terms "offense" and "crime" when referring to a violation of criminal law in section 101(f)(3), (5), (7), and (8). The language of section 101(f)(2), "has committed adultery," by contrast is devoid of terms denoting a violation of criminal law, and therefore must be deemed to incorporate a state civil law definition of "adultery." [5]

■ Moreover, deportation proceedings are civil, not criminal, in nature. *Woodby v. INS*, 385 U.S. 276, 285, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966); *Bufalino v. INS*, 473 F.2d 728, 739 (3d Cir.) (Adams, J., concurring), *cert. denied*, 412 U.S. 928, 93 S.Ct. 2751, 37 L.Ed.2d 155 (1973). The decision to deport rather than permit an application for voluntary departure thus may be based upon considerations derived from the civil law which do not rise to the level of criminal offenses. We hold that the immigration judge properly looked to the definition of adultery contained in the New Jersey civil law in applying section 101(f)(2).

### III.

■ Even if a state civil law definition is adopted, Brea-Garcia urges that his conduct be further examined in light of uniform, federal standards. Reference to state law alone, according to Brea-Garcia, results in a hodge-podge of definitions of "adultery" and renders federal treatment of aliens dependent upon the otherwise irrelevant circumstance of state of residence.

It is instructive to observe that, before passage of the Immigration and Nationality Act of 1952, determination of good moral character was even more of a patchwork than Brea-Garcia contends has been produced by reference to state law. Section 101(f) did not exist, so good moral character was entirely undefined. Case law had established that participation in an adulterous

relationship did not necessarily preclude a showing of good moral character, so long as extenuating circumstances existed. *Johnson v. United States*, 186 F.2d 588 (2d Cir. 1951); *Application of Murra*, 178 F.2d 670 (7th Cir. 1949); *Petitions of Rudder*, 159 F.2d 695 (2d Cir. 1947); *United States v. Rubia*, 110 F.2d 92 (5th Cir. 1940).[6]

The introduction of section 101(f) was interpreted by many courts and by the Immigration and Naturalization Service to be a legislative limitation on the discretion which had hitherto prevailed in the determination of good moral character.[7] Accordingly, anyone who had committed adultery, as defined by state law, was regarded as a matter of law as lacking good moral character. *United States ex rel. Zacharias v. Shaughnessy*, 221 F.2d 578, 579 (2d Cir. 1955); *Gutierrez-Sosa v. Del Guercio*, 247 F.2d 266 (9th Cir. 1957); *In re C__ C__ J__ P__*, 299 F.Supp. 767 (N.D.Ill.1969). *See also Posusta v. United States*, 285 F.2d 533, 535 (2d Cir. 1961); *Matter of P.*, 7 I & N 376 (1956).

Other courts were uncomfortable with the diversity of state definitions of adultery and disliked having the condition of an alien's moral character conclusively dictated by his chance decision as to which would be his state of residence. These courts refused to regard section 101(f)(2) as an automatic and unconditional barrier to relief under section 244(e) whenever an applicant had committed adultery under state law. Beginning with the Ninth Circuit, they evolved a variety of more liberal approaches to section 101(f)(2).

In *Wadman v. INS*, 329 F.2d 812, 817 (9th Cir. 1964), the Ninth Circuit Court of Appeals emphasized that loosening the statutory constraints on good moral character would enable the Attorney General to exercise his discretion to "ameliorate hardship and injustice which otherwise would result

---

**5.** The Immigration Service has consistently used a state civil law definition. 2 *Gordon & Rosenfield, Immigration Law and Procedure* § 7.9d[3] at 7–100 (1975).

**6.** *See* Annot. 22 A.L.R.2d 244 (1952).

**7.** Discussion of the ambiguous legislative history may be found in, *e. g., Petition for Naturalization of O__ N__*, 233 F.Supp. 504, 507–509 (S.D.N.Y.1964); *Dickhoff v. Shaughnessy*, 142 F.Supp. 535, 538–40 (S.D.N.Y.1956).

from a strict and technical application of the law." Accordingly, it rejected any definition of adultery which was not plainly inconsistent with good moral character and declared fatal solely "that extramarital intercourse which tends to destroy an existing marriage; which evidences disregard of marital vows and responsibilities." *Id.* at 817.[8]

Several courts followed *Wadman* in its attempt to construe section 101(f)(2) less harshly. *In re Briedis,* 238 F.Supp. 149, 152 (N.D.Ill.1965), examined whether the alien had "in any real way violated the public morality" or done "any real harm to an existing marriage." Safeguarding the marriage relationship was foremost in *In re Edgar,* 253 F.Supp. 951 (E.D.Mich.1966), so that an alien who was not a "party to a viable marriage" was not disqualified under section 101(f)(2). *Id.* at 954.

The definition which has now been adopted by the Court of Appeals for the District of Columbia Circuit was presented by *Petition of Schroers,* 336 F.Supp. 1348 (S.D.N.Y. 1971):

> Congress in using the word "adultery" was expressing concern over extra-marital intercourse which tends to destroy an existing, viable marriage and which would represent a threat to public morality.

*Id.* at 1350.

In *Moon Ho Kim v. INS,* 514 F.2d 179 (D.C. Cir. 1975), the *Schroers* definition was embraced verbatim. The court stated:

> Neither the Board [of Immigration Appeals] nor this court is concerned with whether petitioner is a person of the very highest moral character, but rather with whether petitioner was guilty of an adultery, defined under a national standard, that completely negatives good moral character.

*Id.* at 181.

We are reluctant to adopt the definition of adultery as it has evolved in the Ninth

and District of Columbia Circuits. To define adultery as only that behavior which is unquestionably inconsistent with good moral character, as *Wadman* and *Moon Ho Kim* have done, is to read section 101(f)(2) out of the Act. Congress, by inserting in the 1952 Act categories of conduct which it deemed indicative of bad moral character, was apparently modifying the requirement of good moral character to that extent. We question the propriety of reverting to "good moral character" alone as a touchstone, shorn of section 101(f) guidelines.

The majority of the other provisions of section 101(f) require reference to state law and therefore also differ in application according to an alien's state of residence. For example, within (f)(5), (7), and (8) are included those who have been convicted of violations of various state criminal laws. Section 101(f)(4) describes a class of those whose income has been derived from "illegal gambling," an activity which the federal government leaves to states to define.

Arguably, Congress intended to defer to the state in which an alien chooses to live for the precise definition of adultery and other conduct inconsistent with good moral character, for it is that particular community which has the greatest interest in its residents' moral character. Since the impact of an alien's behavior is felt foremost in the community where he lives, his behavior more appropriately should be held to the accepted standards of his state of residence rather than to the "national standard" adopted in *Moon Ho Kim v. INS, supra.*

Community moral standards have been recognized in contexts other than the immigration and naturalization laws. Obscenity, for instance, is determined by reference to "contemporary community standards" and not "national standards." *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). The community so defined need not even be a "hypothetical statewide community," but may be local. *Jenkins v. Georgia,* 418 U.S. 153, 157, 94 S.Ct. 2750, 41

---

**8.** A subsequent decision by a special inquiry officer that adultery, as defined by state law, precludes good moral character for section

244(e) was vacated as a failure to exercise a discretionary function in *Cabrera v. INS,* 415 F.2d 1096, 1098 (9th Cir. 1969).

L.Ed.2d 642 (1974). Thus, in the important decision whether to extend First Amendment protection, the Supreme Court has mandated the application of standards which will necessarily vary from case to case.

In view of the precedent in related areas, we cannot say that the application of varying standards for determining whether an alien has committed adultery is necessarily repugnant to a federal scheme. Rather we appreciate the reasons which may underlie the use of state definitions of unacceptable conduct and are therefore reluctant to adopt a national standard here.

The collateral issues which the *Moon Ho Kim* test would inject into the already complex and time-consuming immigration procedures are endless. The immigration judge would be compelled to sit as an arbiter of the viability of marriages, a task which few mortals are qualified to undertake. He would also be required to determine what quantum of adulterous conduct constitutes a threat to the vague and amorphous concept of "public morality." The matter would not end with his decisions. Appeals unquestionably would be taken on these issues, which are at most tangential to the real question before the judge. We believe these avenues of inquiry unnecessarily would burden and further complicate immigration hearing procedures.

Furthermore, the Immigration and Naturalization Service, at oral argument before this court, represented that it does not rigidly apply state law definitions of adultery to reach technical or isolated incidents of adultery.[9] The Service indicated that its policy is to take account of extenuating circumstances in order to disqualify only those who have embarked on a course of conduct which fits within the state definition of adultery.

■ In the instant case, the conduct was neither isolated nor inconsequential. The immigration judge found that "a viable marriage was apparently destroyed by respondent's [Brea-Garcia] adulterous relationship." In addition, Brea-Garcia's subsequent marriage, on these facts, does not erase his prior adulterous relationship with its resulting births out of wedlock. Since he has committed adultery within the meaning of section 101(f)(2), Brea-Gracia is conclusively presumed to be a person lacking good moral character for purposes of section 244(e) and thus may not be permitted to depart voluntarily.

■ Brea-Garcia's further argument that deporting him is cruel and unusual punishment has been resoundingly rejected on the basis that deportation is a civil proceeding. *Fong Yue Ting v. United States,* 149 U.S. 698, 13 S.Ct. 1016, 37 L.Ed. 905 (1893); *Santelises v. INS,* 491 F.2d 1254 (2d Cir.), cert. denied, 417 U.S. 968, 94 S.Ct. 3171, 41 L.Ed.2d 1139 (1974); *Bufalino v. INS, supra,* 473 F.2d at 739; *Rodriguez-Romero v. INS,* 434 F.2d 1022 (9th Cir. 1970), cert. denied, 401 U.S. 976, 91 S.Ct. 1199, 28 L.Ed.2d 326 (1971).

We find no merit in Brea-Garcia's remaining contentions. The decision of the Board of Immigration Appeals will be affirmed.

GIBBONS, Circuit Judge (concurring).

I join in Judge Rosenn's opinion to the extent that it holds that 8 U.S.C. § 1011(f)(2) does not refer to the definition of adultery in the state criminal law. I do not agree that it incorporates the definition of adultery in state civil law. In the absence of clear guidelines from Congress it seems to me that the approach of the District of Columbia Circuit in *Moon Ho Kim v. INS,* 514 F.2d 179, 180 (D.C. Cir. 1975), construing the statute as creating a uniform federal definition—viz., extra-marital intercourse which tends to destroy an exist-

---

**9.** "Technical adultery," in which the parties entered into marriage in good faith after a technically invalid divorce of one partner, has long been excluded from the operation of section 101(f)(2). *Dickhoff v. Shaughnessy, supra; Matter of U.,* 7 I & N 380 (1956); 2 *Gordon & Rosenfield, Immigration Law and Procedure* § 7.9d[2] at 7–102 (1975). *See also In re Johnson,* 292 F.Supp. 381 (E.D.N.Y.1968) (alien unaware of partner's existing marriage).

ing, viable marriage and which represents a threat to public morality—makes sense.

Admittedly, a more exact formulation could be devised. Moreover, a uniform definition adopted by the agency in rule-making proceedings would be most helpful to the courts. But the interest in uniformity in our immigration and naturalization laws is paramount, so the task of federalizing the definitional standard necessarily devolves upon us. I do not share Judge Rosenn's concern that an inquiry into the viability of marriages would prove too burdensome and perplexing to the Immigration and Naturalization Service. Indeed, the Immigration Judge made such an inquiry in this very case.

Because application of the *Moon Ho Kim* standard or a state civil definition leads to the same result in this case, I concur in the judgment of the court.