The evidence demanded a finding that the plaintiff had not entered into a common-law marriage de praesenti with the defendant, which is a valid married status in this State; and there being in this State no common-law marriage de futuro cum copula, which the defendant contends a jury would be authorized to find from the evidence, the court erred in allowing alimony and attorney's fees on either theory of the alleged common-law marriage between the parties.
 No. 14534. JUNE 11, 1943. REHEARING DENIED JULY 9, 1943.
 STATEMENT OF FACTS BY DUCKWORTH, JUSTICE.
Sadie Mae Peacock brought suit against John W. Peacock for alimony and attorney's fees, and alleged a common-law marriage. The court awarded alimony in a stated sum per month, and attorney's fees, and the exception is to that judgment. The evidence on the trial was substantially as follows:
The plaintiff testified: "I am . . twenty-seven years of age. Mr. Peacock is forty or forty-one, I don't know exactly. . . In May, 1940, I was working at the Busy Bee Cafe as a waitress. . . Mr. Peacock visited me . . two or three times a week. . . At first we were just friends, later on lovers. . . Mr. Peacock had been formerly married, . . I know we discussed it in May, 1940. He told me he was getting a divorce, and later told me he had obtained a divorce, that it was final. After that we talked of marrying. That was in November. . . He discussed his financial situation with me, and said we could not marry on his present salary, and that we would have to wait until he got a better job. He did propose marriage to me about the middle of December. We did not set any definite time, but we were to get married in the future. I accepted his proposal to get married. . . I had not had sexual intercourse with him before this engagement. We did not have sexual intercourse until after we decided to marry. We said we would get married, but we did not set any special date. I had sexual intercourse with him about the middle of December, after our agreement to be married. At that time I was living at the Bon Air Hotel. I remained at the Bon Air Hotel until June, 1941. We were still talking about getting married, and making plans. I had sexual intercourse with him during that time. I would say about once a week. His conduct towards me was the same as before *Page 442 
our engagement. I left Bainbridge the end of June, and went to Columbus. Mr. Peacock was in Columbus at that time. He went to Columbus Easter Sunday, which was about April 1st. He was assistant fire chief of an army division." The plaintiff testified that in Columbus he stayed with a cousin, J. H. Steadham and his wife; testified as to her visits to Peacock at his place of work, a visit to Bainbridge and to Atlanta, and her return to Columbus on July 14, 1941, and where, at her cousin's, he came to see her two or three times a week and had sexual intercourse with her, her return to her father's home in Bainbridge, and occasional trips to Columbus until the last of October, where Peacock would come to see her and the same relations continued, her stay in Bainbridge until a trip to Columbus in January, 1942, her return to Bainbridge where she worked in the cafe until the last of February, when she again went to Columbus to consider a job which Peacock suggested but which she did not accept, staying with her cousin except for two weeks in Bainbridge in April, 1942, from which latter point Peacock took her to Columbus, the two stopping en route at a hotel in Cuthbert, Georgia, spending the night in the same room and in the same bed, the registration card signed by Peacock, and introduced in evidence, showing the name "John W. Peacock," and "No. in party 2," as identified by the clerk of the hotel.
She further testified: "Mr. Peacock came out to see me while I was at my cousin's house on that occasion, two or three times a week. My cousin was at home, but his wife was not. . . My cousin had been informed of our union as man and wife. I told him that we were married. . . We spent some time in the same room. He spent one night there, one Saturday night. . . He slept in the same room and in the same bed with me, and my cousin was there. I came home (to Bainbridge) about the 11th of June, 1942. He gave me money and paid board for one month. During the time I went to Atlanta, which was about the 12th or 13th of May, and visited Mr. and Mrs. J. T. Steadham, a cousin of mine. Mr. Peacock was there attending a fire convention. I saw him on that occasion several times. We met other people. My cousin introduced us to them as Mr. and Mrs. Peacock. She introduced us to six people. Mr. Peacock at that time did not deny that he was my husband. . . I spent one night with John [the defendant] at the Jefferson Hotel, . . and spent the night with him in the *Page 443 
same room together, in the same bed. . . When he left [Atlanta] he gave me money to come on the bus, that is, come home on. I stayed in Atlanta until the following Sunday week. I did not go with any one while I was there. During all the time I was in Columbus I did not go with other men. When I got back to Columbus I saw Mr. Peacock the first night I was there at my cousin's house under the same circumstances I had seen him before. . . I stayed in Columbus until about the first of June. Then my cousin moved down to Bainbridge. I remained in Columbus. John had rented a room for us. His cousin came up there and didn't have any place to stay, and we used the room. . . I stayed in the room about two weeks. Mr. Peacock visited me regularly, and the same relation was going on between us. . . When I came to Bainbridge I went to my father's home, and have been there ever since. I returned to Bainbridge because John said he was coming down about the first of July to take a job out at the air base as fire chief. I am now pregnant, and have been for about eight months. . . I next saw John about the 22nd of July. He came out to my house. . . I next saw Mr. Peacock two or three weeks later, and discussed with him my condition. He said we would get married, but we could not get married around here, because our family thought we were already married, and that we would have to go out of town. He didn't deny the child was his, and has never denied it. . . I next saw Mr. Peacock the last of August. He still said we would get married, but could not marry here, because my cousin and my family thought we were already married. I said we were engaged when we first had intercourse. . . I believed in good faith in our engagement at the time we had intercourse, believing in him, loving him, and believed he loved me."
Mrs. J. H. Steadham, with whom the plaintiff had lived in Columbus, testified, that during that time the plaintiff had told her that she and the defendant were married, and that her husband knew that they were married because the plaintiff had so told him; that they tried to make them welcome as man and wife; that the defendant came to see her occasionally, just as any other young man would go to see a young lady; that there was nothing in their conduct that was unusual or out of the way while there; and that he never spent a night there. *Page 444 
Mrs. J. E. Steadham testified, that she was the stepmother of the plaintiff, and that she told her nothing except that they were married, and when the defendant came to her home she treated him just as she would any visitor or relative of the family, "just social."
J. E. Steadham testified, that he was the father of the plaintiff, knew she and the defendant were going together and he heard that they were married; that he asked her about it and she told him they were secretly married; that the defendant came to his house and the witness treated him nicely and thought he was one of the family; that he swore out a warrant for seduction against the defendant on October 27, 1942, and the next morning he called on the defendant and told him he wanted him to do the proper thing, and he refused to do anything. Steadham further testified that his daughter had admitted to him that no ceremony had been performed; and that the warrant was sworn out on the advice of a lawyer.
Mrs. R. D. Humphrey testified, that she had heard that the plaintiff and the defendant were married, and while at J. E. Steadham's home, when the plaintiff and the defendant were present, the plaintiff introduced her to the defendant, that she did not remember that she introduced him as her husband, but she told him she was glad to know him and that she hoped he would take care of "our girl," thinking that they were married; that she did not think that he made any reply; that her husband had told her they were married; and that she thought he was the only person with whom she had discussed the matter.
J. H. Steadham testified, that the plaintiff visited his home in Columbus; that the defendant came to see her possibly two or three times a week; that the plaintiff had told him in July, 1941, that they were married; that afterward he treated the defendant as a friend and as a gentleman and as one of the family, stating that he would be welcome at his home at any time; that afterward the defendant spent one night at his home on a couch in the living room with the plaintiff; that the plaintiff was a single girl when she first started visiting his home in Columbus, but his information was that she was engaged to the defendant at that time, and later she told him that they were married, and asked him and his wife to keep it a secret; that the defendant never stayed at his home except one night and the latter part of a night; that he visited the *Page 445 
defendant with the plaintiff's father on the morning of the day the seduction warrant was sworn out, and threatened to whip him if he did not marry the plaintiff, and it was a night or two before that the plaintiff told the witness that she and the defendant were not married, and that the reason she fooled them at Columbus was that she expected the defendant to marry her.
The plaintiff, recalled, testified: "John made a statement to me with reference to getting me a place to live. When I came home with him in February he said he would get a place out in Baker Village, between Columbus and Fort Benning. . . I had an understanding with Mr. Peacock with reference to keeping secret our relationship. One thing was that we couldn't live on his present salary; and he said he didn't want to worry his mother about it, that she had heart trouble. . . I told John Peacock later about my parents knowing about our relations. He said not to worry, we would be married in the future. . . I had a telephone conversation with him later. I asked him when he was coming; and he said he was not coming, that he was through with me. It was after the telephone conversation that I told my father that there was no ceremony."
There was testimony that the defendant had been introduced as the husband of the plaintiff in her presence, and had made no protest. He denied that such introduction had been made. Two of those to whom it had been testified that he had been so introduced denied in interrogatories that the introductions had been made. The defendant testified, that he sought without success to locate all those named in an affidavit as persons to whom he was introduced as the husband of the plaintiff; that he did locate two who refused to talk to him, but later by interrogatories, as above referred to, denied that such introductions had been made; and that the one who by affidavit had represented that he had been introduced to several persons as the husband of the plaintiff refused to tell him where such persons could be found. There was conflicting testimony as to whether or not the plaintiff had dates with men other than the defendant; and certain witnesses swore that the plaintiff did not hold herself out as being married. There was evidence that she traded in her own name as Sadie Mae Steadham. A former employer testified that she accepted salary checks and indorsed them in the name of Sadie Mae Steadham, by which she *Page 446 
was known to him. There was testimony that the defendant did not represent himself to be a married man.
The defendant testified, that he became acquainted with the plaintiff when he was boarding at the Busy Bee Cafe in 1940; that he went with her off and on until early in 1942, and during that time never proposed marriage to her or held himself out to any one as her husband, and never had occasion to know that she was holding herself out as his wife; that nobody in his presence ever referred to her as Mrs. Peacock; that at the home of the Steadhams, while Mrs. Steadham was away, he and Henry Steadham and the plaintiff were drinking one night, and he had too much, and waked up the next morning on a couch in the living room, and the plaintiff was on there with him, but that during the night he did not have intercourse with her; that he first learned that the plaintiff was pregnant when she came to his house some time in July in Bainbridge about 11 o'clock one night; that she said they would have to get married, and that was the first time it was ever discussed between them; that he did not admit the paternity of the child; that marriage had never been discussed between them up to that time; that he did not agree to marry her; that he told her he was sorry but he did not do it, but would help her any way he could; that at the hotel in Cuthbert he did not hold her out as his wife; that he called on her two or three times a month in Bainbridge, and called on her in Columbus at the home of J. H. Steadham; that he did not tell her he would have a ceremony performed, or that since people thought they were married they would have to go to another State and have the ceremony performed quietly, and did not try to get her to have an abortion or discuss it with her.
It was agreed between the parties that the defendant had obtained a divorce from his former wife, the final decree at the November term, 1942, of the superior court.
Whether or not the court erred in rendering judgment for alimony and attorney's fees is to be determined by an answer to the question whether or not the evidence authorized a finding that the plaintiff and the defendant were husband and wife under a common-law marriage recognized in this State. See Morgan v. Morgan, 148 Ga. 625
(97 S.E. 675, *Page 447 
4 A.L.R. 925); Pennaman v. Pennaman, 153 Ga. 647 (112 S.E. 829);Foster v. Foster, 178 Ga. 791 (2) (174 S.E. 532). The plaintiff in error contends that the evidence conclusively shows only a meretricious relationship between the parties. The defendant in error argues that, if a common-law marriage per verba de praesenti is not deducible from the evidence, certainly a marriage per verba de futuro cum copula might reasonably be found. A mere reading of the evidence demonstrates that at no time did the parties expressly agree that then and there the plaintiff took the defendant as her husband and that he took her as his wife. No ceremonial marriage was claimed. Throughout the testimony of the plaintiff, fully set out above, she made it clear that no marriage de praesenti was entered into. She met the defendant in May, 1940, when he was a married man. They "talked of marriage" in November, 1940. He proposed about the middle of December, 1940; "we did not set any definite time, but we were to get married in the future, . . but we did not set any special date. Until June, 1941, during which time she claims he had intercourse with her at various times, "we were still talking about getting married and making plans." When she returned to her home in Bainbridge because the defendant expected to take a position there, and after he came to her home on July 22, 1942, and she next saw him two or three weeks later and discussed with him her condition of pregnancy, he said "we would get married, but we could not get married around here, because our family thought we were already married, and that we would have to go out of town. . . I said we were engaged when we first had intercourse. I believed in good faith in our engagement at the time we had intercourse, believing in him, loving him, and believed he loved me." She informed her cousin, J. H. Steadham, and his wife, in Columbus that she and the defendant were married, but asked that for stated reasons the marriage be kept secret; and Steadham testified that a day or two before a seduction warrant was sworn out by her father she told him that she and the defendant were not married, and that the reason she "fooled them at Columbus" was that she expected the defendant to marry her. There was testimony that the defendant had been introduced to various persons as the husband of the plaintiff, and that he accepted such introductions without protest. All of this he denied, and he testified that he never agreed to become her husband at any time; *Page 448 
and it was not shown that he ever referred to her as his wife. But assuming that he acquiesced in such introductions and that the parties were regarded by numerous persons as being married, and that by her relatives he was welcomed and treated as her husband, such facts would not establish the fact of marriage or a consensus, but only be evidential of a previous agreement by which he and the plaintiff agreed to be husband and wife, or, as sometimes stated, the acts and conduct of the defendant would create only a presumption that they had entered into such an agreement by express words. See Drawdy v. Hesters, 130 Ga. 161
(3) (60 S.E. 451, 15 L.R.A. (N.S.) 190). The presumption or inference to be drawn from such conduct, however, is overcome and set at naught by the plain testimony of the plaintiff herself, conclusively showing that at no time did she regard herself as the wife of the defendant or that there was any agreement de praesenti by which they became husband and wife, but that at some time in the future they would assume such relationship. "To constitute a valid marriage per verba de praesenti there must be an agreement to become husband and wife immediately from the time when the mutual consent is given. An express future condition is absolutely fatal to a claim of marriage, and cannot be explained away by circumstances. It shows mental reservations which are incompatible with consent. This is true whether the condition relates to the creation of the marriage status, or to the duration of the relations of the parties. As there can be no contract per verba de praesenti where the marital status is to become fixed in the future, it is not sufficient to agree to present cohabitation and a future regular marriage when more convenient, or when a wife dies, or when a ceremony can be performed." 18 R. C. L. 392, § 13.
But, says the defendant in error, the evidence authorized a finding that a marriage per verba de futuro sum copula existed at the time of the filing of the application for alimony; and we are urged to recognize the doctrine of such common-law marriage as is referred to in Askew v. Dupree, 30 Ga. 173. In that case only a marriage per verba de praesenti was involved. In the opinion Judge Lumpkin, speaking for the court, said that he could do no better than to adopt as controlling an opinion written by the learned trial judge, which was set out in full in the opinion of this court, and in which opinion of the trial judge he recognized as valid marriages *Page 449 
at common law either one per verba de praesenti or one per verba in futuro cum copula, following which quotation Judge Lumpkin added: "The conclusions to be deduced from the whole matter are these: That marriage is founded in the law of nature, and is anterior to all human law; that in society it is a civil contract; that if the contract is per verba in praesenti — that is, I take you to be my wife, and I take you to be my husband — though it be not consummated by cohabitation, or if it be made per verba de futuro, and be consummated, it amounts to a valid marriage, in the absence of all municipal regulations to the contrary; and that notwithstanding there be statutes directing a license to issue, as in this State, and inflicting a penalty on any minister or magistrate who shall unite the parties in wedlock, without such license, yet, in the absence of any positive enactment declaring that all marriages not celebrated in the prescribed form shall be void, a marriage deliberately and intentionally entered into by the parties, who are able to contract according to the rules of the common law, without conforming to the enactment, is still a valid marriage." Obviously what was said in respect of a common-law marriage per verba de futuro cum copula in a case where only a marriage per verba de praesenti was under consideration was obiter dicta, and is not binding upon this court. Whether or not such a marriage is valid under the common law of this State has never been presented for decision. In Lefkoff v. Sicro, 189 Ga. 554, 561
(6 S.E.2d 687, 133 A.L.R. 738), quoting from the Askew case, supra, that "Marriage, being a contract, is of course consensual, for it is of the essence of all contracts to be constituted by the consent of both parties" and that "Marriage being a civil contract, it is not necessary that it be solemnized by a person in holy orders, and in facie ecclesia," this court continued the quotation from the Askew case by incorporating the language with respect to a marriage per verba de futuro cum copula (in words of the future tense), following which it cited and discussed two old English cases, together with citations to several text-writers of note, but proceeded to dispose of only the question whether or not the trial court, in a case where a marriage de praesenti was claimed, erred in charging the jury that there could be no common-law marriage if either or both of the parties concealed from the public generally such claimed relation of husband and wife. That decision constitutes no authority on the question now *Page 450 
under discussion; and what, if any, recognition was given to the validity of a common-law marriage de futuro cum copula must be treated as obiter dicta.
Not only does it not appear that the doctrine, if existing at common law, has not been declared in this State, but it is asserted by respectable authority that the idea that it ever existed in England was due to misconceptions of those who announced the fact. In Duncan v. Duncan, 10 Ohio St. 181, 183, decided in 1859, it was said: "The idea that a contract for a future marriage, followed by cohabitation as husband and wife, is itself a valid marriage at common law seems to have obtained currency on the credit of remarks made by several elementary writers of distinguished learning and ability, and by certain judges of high character, speaking by way of obiter dicta, in cases in which this question was really in no way involved. But the better opinion now seems to be that these remarks are unsupported by any case actually adjudicated and entitled to be considered as authoritative; and the mistaken doctrine seems to have originated either in the inadvertent confounding of what might, in the absence of rebutting evidence, be good presumptive evidence of a marriage, with marriage itself, or from the fact that such a contract per verba de futuro, followed by cohabitation, was one of which the canon law, as administered by ecclesiastical courts in England, until restrained by statute, would enforce the specific performance." Time does not seem to have brought about any general acceptance of the doctrine. In 35 Am. Jur. 210, § 42, it is stated: "It has been said that the canon and common law recognize marriages per verba de futuro cum copula or, in other words, marriages through carnal intercourse after an agreement to be married in the future, the law presuming a present consent from such agreement and intercourse; and such marriages have to a certain extent been recognized in American cases. But the view has been taken that such presumption may be overcome by facts showing that the parties did not intend at the time of the intercourse to enter into the marriage relation. It has been ruled that marriage is merely evidenced, and not constituted, by this form of contract; and the prevailing rule in this country is, that, despite a previous agreement to marry, there must be an actual present agreement to be married and that without such an actual present agreement no marriage results from intercourse. . . Indeed, in some jurisdictions *Page 451 
the doctrine has been rejected in toto, and it seems to be a shadow of its former self even in the jurisdictions that have not expressly repudiated it as a whole; it has been observed that it is a fair conclusion that the doctrine is nearly, if not quite, obsolete." In 38 C. J. 1319, § 94, it is stated: "With regard to common-law marriages effected by the express agreement of the parties, a distinction is made between contracts per verba de praesenti, that is, where the parties take each other in the present tense, implying that the marital relation is constituted immediately, and contracts per verba de futuro, which imply no more than that the parties will marry each other at a later time. Contracts of the former sort, when duly acted upon, create a valid marriage, while words evidencing only the intention to be married in futuro are ineffectual even where followed by cohabitation. It has been sometimes said, however, that a contract per verba de futuro cum copula is a valid marriage, provided that the copula is a fulfillment of the marriage promise. But under the better rule, words showing only an intention to contract in marriage in futuro will be ineffectual to establish the requisite consent in any event; and unless they are followed by a new promise express or implied in praesenti, the copulation of the parties is meretricious."
In Hornsby v. Smith, 191 Ga. 491, 496 (13 S.E.2d 20, 133 A.L.R. 684), it was recognized that "By an act of the General Assembly approved February 25, 1784 (Cobb's Dig. 721), the common law of England was made the law of this State. . . Section 1 of that act made all laws that were of force in the State on May 14, 1776, including the common law, so far as they were not contrary to the constitution, laws, and form of government now established in this State, of full force and effect upon the passage of that act." It was pointed out that inTurner v. Thompson, 58 Ga. 268 (24 Am. R. 497), this court, after recognizing that at common law the right to an easement of light and air passing over another's land through ancient windows may be acquired by use for twenty years, observed that most of the American courts had repudiated this common-law doctrine as being wholly inapplicable, because it was not suited to a young and growing country; and in the Hornsby case it was said: "Thus the Georgia case mentioned is authority for holding that common-law rules unsuited to the conditions in this State are not of force here and were not made so by the act of 1784. *Page 452 
And we think the common-law rule on this subject is not the law of this State." We have no hesitancy in holding that a common-law marriage per verba de futuro cum copula is abhorrent to the conditions of life and customs in this State, as well as the public policy of this State as disclosed in the Code, §§ 26-5801, 26-6001, 53-101, and is not of force here. What was said in Duncan v. Duncan, supra, rejecting the doctrine under consideration, is still more pertinent now: "Finding ourselves, then, compelled by no preponderating force of authority to the adoption of a doctrine so loose as that which would be necessary to sustain the marriage claimed to exist in this case, we are unwilling to do so. It seems to us that grave considerations of public policy forbid it; that it would be alien to the customs and ideas of our people, and would shock their sense of propriety and decency. That it would tend to weaken the public estimate of the sanctity of the marriage relation; to obscure the certainty of the rights of inheritance; would be opening a door to false pretenses of marriage, and to the imposition upon estates of supposititious heirs; and would place honest, God-ordained matrimony and mere meretricious cohabitations too nearly on a level with each other."
The evidence demanded a finding that the plaintiff had not entered into a common-law marriage de praesenti with the defendant, which is a valid married status in this State; and there being in this State no common-law marriage de futuro cum copula, the court erred in allowing alimony and attorney's fees on either theory of the alleged common-law marriage between the parties.
Judgment reversed. All the Justices concur.