**Ruta Marie KAHN, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 91–70544.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 3, 1993.

Originally Filed March 25, 1994.

Amended Sept. 28, 1994.

Further Dissent Filed Sept. 28, 1994.

Frank T. Vecchione, San Diego, CA, for petitioner.

Anne C. Arries, U.S. Dept. of Justice, Washington, DC, for respondent.

Before: BROWNING, HUG, and KOZINSKI, Circuit Judges.

PER CURIAM:

Ruta Marie Kahn, a native and citizen of Canada, was admitted to the United States as a permanent resident alien in 1978 and has lived in California since. Kahn was convicted of money laundering and conspiracy to manufacture methamphetamine. The Immigration and Naturalization Service (INS) found Kahn deportable under 8 U.S.C. §§ 1251(a)(11) and 1251(a)(4)(B) because of her drug conviction, and she petitioned for a waiver of deportation under § 212(c) of the Immigration and Nationality Act (INA). 8 U.S.C. § 1182(c). Her petition was granted by an Immigration Judge (IJ), but denied on review by the Board of Immigration Appeals (Board). Kahn appeals.

I

The INS requires an alien who has been convicted of a serious drug offense to demonstrate outstanding equities in her favor to be considered for a waiver of deportation under § 212(c). *Ayala–Chavez v. INS,* 944 F.2d 638, 641 (9th Cir.1991). In determining whether to grant relief under § 212(c), the Board has refused to adopt an inflexible test, preferring instead a test that looks to the individual merits of each case. The IJ must balance the social and humane considerations presented on the alien's behalf against the adverse factors including the alien's undesirability as a permanent resident. *Yepes–Prado v. INS,* 10 F.3d 1363, ——, No. 91–70114, slip op. 11477, 11481–82 (9th Cir.1993); *Matter of Marin,* 16 I. & N. Dec. 581, 584–85 (1978). Among the factors to be weighed in a petitioner's favor is the existence of family ties within the United States.[1]

The IJ heard testimony from Kahn and others about her long-standing relationship with a Mr. Caldwell, with whom she had been living for several years. Caldwell characterized the relationship as "like [a] common-law" marriage and stated the couple intended to marry if Kahn were not deported. Members of Caldwell's extended family testified to the existence and strength of Kahn's rela-

1. Other positive factors include residence of long duration in this country, hardship to the alien and family if deported, history of employment, property or business ties, community service, and, when there is a criminal record, genuine rehabilitation. Negative factors include the nature of the ground for deportation, the presence of other violations of the immigration laws, the nature, recency, and seriousness of any criminal record, and the presence of any other evidence of the applicant's bad character or undesirability as a legal permanent resident of the United States. *Marin,* 16 I. & N. Dec. at 584–85.

tionship with Caldwell and with them. The IJ found Kahn's family ties in the United States were strong, and on the basis of this and other equities granted Kahn's request for a waiver under § 212(c). The Board reversed.

The Board recognized that the existence of substantial family ties in the United States is a weighty factor in the support of the favorable exercise of discretion under § 212(c). In evaluating Kahn's family ties in this country, however, the Board found conclusive the fact that California, her state of residence, did not recognize common law marriages. The Board said:

> We ... do not find the respondent's relationship to Mr. Caldwell to be a substantial equity. During the hearing, Mr. Caldwell testified that he considered the respondent to be akin to a common law wife. However, common law marriages are not recognized in California. *See Malhiot v. Southern California Retail Clerks Union,* 735 F.2d 1133 (9th Cir.1984), *cert. denied,* 469 U.S. 1189 [105 S.Ct. 959, 83 L.Ed.2d 965] (1985).

The government asks this court to adopt the Board's analysis and make state law determinative of family ties for purposes of discretionary relief under § 212(c): "[B]ecause California law does not recognize common law marriage, the petitioner's relationship ... was not a substantial equity." (Gov. Brief p. 16).

## II

The Board, acting on behalf of the Attorney General, may establish standards to guide the exercise of discretion in granting waivers of deportation under § 212(c) "as long as [they] are rationally related to the statutory scheme." *Ayala–Chavez,* 944 F.2d at 641. A standard must be based on a permissible interpretation of the statute, although it need not be "the only one [the agency] could permissibly have adopted ... or even the reading the court would have reached if the question had arisen in a judicial proceeding." *Chevron v. Natural Res. Def. Council,* 467 U.S. 837, 843 n. 11, 104 S.Ct. 2778, 2782 n. 11, 81 L.Ed.2d 694 (1984).

The Board erred as a matter of law in adopting state law as the conclusive measure of family ties in the United States for purposes of § 212(c) relief. The Supreme Court has held on numerous occasions that "in the absence of a plain indication to the contrary, ... Congress when it enacts a statute is not making the application of the federal act dependent on state law." *Jerome v. United States,* 318 U.S. 101, 104, 63 S.Ct. 483, 485, 87 L.Ed. 640 (1943); *see Mississippi Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 43, 109 S.Ct. 1597, 1605, 104 L.Ed.2d 29 (1989); *Dickerson v. New Banner Institute, Inc.,* 460 U.S. 103, 119, 103 S.Ct. 986, 995, 74 L.Ed.2d 845 (1983); *NLRB v. Natural Gas Utility Dist. of Hawkins County,* 402 U.S. 600, 603, 91 S.Ct. 1746, 1748, 29 L.Ed.2d 206 (1971); *United States v. Turley,* 352 U.S. 407, 411, 77 S.Ct. 397, 399, 1 L.Ed.2d 430 (1957). This presumption is especially appropriate where the federal statute is generally intended to have uniform nationwide application and where the federal program would be impaired if state law were to control. *Mississippi Band of Choctaw Indians,* 490 U.S. at 43–44, 109 S.Ct. at 1606.

These principles are applicable here. The INA "was designed to implement a uniform federal policy," and the meaning of concepts important to its application are "not to be determined according to the law of the forum, but rather require[ ] a uniform federal definition." *Rosario v. INS,* 962 F.2d 220, 223 (2nd Cir.1992) (applying by analogy *Mississippi Band of Choctaw Indians* ). Common law marriages are accorded legal status under the laws of thirteen states and the District of Columbia, but are denied such status under the laws of twenty-seven states, including California. *See* Ellen Kandoian, *Cohabitation, Common Law Marriage, and the Possibility of a Shared Moral Life,* 75 Geo.L.Rev. 1829, 1831 n. 11 (1987). Under the Board's standard the state of an alien's residence has a conclusive veto power over the circumstances the Board may consider in exercising its discretion under § 212(c). Nothing in § 212(c) justifies granting such power to state law and treating similarly situated aliens disparately. In the absence of an express or implied Congressional intention to the contrary, the Board's adoption of

a standard that conclusively defines family ties under § 212(c) by reference to legal classifications that vary from state to state is not rationally related to the INA's purpose and is not a permissible interpretation of the Act.[2]

The dissent asserts that the Board is simply following a general rule that federal law relies on state law to define personal and family relationships. Each statute cited by the dissent in support of this general rule either expressly states or strongly implies that its application is controlled by a person's status under state law. Where marriage is relevant to gaining admittance to the United States, for instance, the INA defines a "qualifying marriage" as one which "was entered into in accordance with the laws of the place where the marriage took place." 8 U.S.C. § 1186a(d)(1)(A)(i)(I).[3] The dissent has cited no case in which application of a uniform federal statute such as the INA has turned entirely on a person's status under state law, without express Congressional authorization.[4]

■ The dissent also misses the mark when it concludes we require the Board to adopt a federal law of domestic relations and prevent the Board from giving weight to the legal status of an alien's relationship with a United States citizen. We merely hold that the Board may not bar consideration of otherwise relevant facts based upon the law of the state in which petitioner resides when exercising its discretion under § 212(c). In deciding whether to grant a waiver of deportation, the Board must apply a flexible, uniform standard that reflects the federal policies underlying § 212(c) as implemented in *Matter of Marin, supra.* It may consider the status of an alien's relationship under state law when analyzing an alien's ties to the United States. However, the Board cannot be barred from considering the substance of the relationship in determining the strength of the alien's ties to the United States.[5]

2. *See Moon Ho Kim v. INS,* 514 F.2d 179, 180–81 (D.C.Cir.1975) ("The legislative history of the [INA] and the plethora of definitions incorporated in it, Title 8 U.S.C.A. § 1101(a), leave little doubt that Congress was seeking uniformity. To adopt a rule [that relied on the law of the state to define 'adultery'] would be to destroy any meaningful uniformity as to the definition of 'adultery' as used in the Congressional enactment. The divergencies in meaning are expandable to utter diversification once recourse to the law of the state of the alleged offense is resorted to."); *Wadman v. INS,* 329 F.2d 812 (9th Cir.1964) (applying federal definition of "adultery" under § 101(f)(2) of the pre–1981 INA); *but see Bera–Garcia v. INS,* 531 F.2d 693 (3rd Cir.1976) (applying state law definition of "adultery").

3. *See also* 42 U.S.C. § 416(h)(1)(A)(i) (social security) ("An applicant is the wife, husband ... of a fully or currently insured individual for purposes of this subchapter if the courts of the State in which such insured individual is domiciled at the time such applicant files an application ..., would find that such applicant and such insured individual were validly married...."); Fed. R.Evi. 501 (marital privilege) ("[I]n civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law."); 18 U.S.C. § 1961(1)(A) (defining predicate acts for a RICO violation by reference to state law); 18 U.S.C. § 922(g)(1) (defining a felon in possession of a firearm as a person who is under indictment for, or who has been convicted in *any* court of, a crime punishable by imprisonment for a term exceeding one year.") (emphasis added); 18 U.S.C. § 921(a)(20) (defining "crime punishable by imprisonment of a term exceeding one year" by referring in part to state law); *Burnet v. Harmel,* 287 U.S. 103, 110, 53 S.Ct. 74, 77, 77 L.Ed. 199 (1932) ("State law may control only when the federal taxing act, by express language or necessary implication, makes its own operation dependent upon state law.").

4. The Ninth Circuit cases cited by the dissent are not exceptions. In *Adams v. Howerton,* 673 F.2d 1036 (9th Cir.1982), the court interpreted a provision of the INA that establishes immigration quotas and a system of preferential admissions based on the existence of certain family relationships. This provision explicitly states that a "spouse" of a United States citizen is entitled to preferential treatment. 8 U.S.C. § 1151(b). Likewise, in *United States v. Sacco,* 428 F.2d 264 (9th Cir.1970), the court interpreted a 1855 statute that conferred citizenship on the children of any woman who "married" a United States citizen.

5. Kahn offered substantial evidence that she had an established, long live-in relationship with Caldwell and a warm and continuing relationship with Caldwell's family. The IJ characterized her relationship with Caldwell as "close and deeply emotional." The IJ relied on these facts in casting the balance in favor of Kahn under § 212(c).

## III

The Board's evaluation of Kahn's family ties in this country was only one of several factors the Board weighed in casting the balance against Kahn's request for a § 212(c) waiver. Nonetheless, it was clearly a significant one. Since the Board adopted a definition of family ties that was unauthorized by the statute, the judgment of the Board must be vacated and the matter remanded for reconsideration, and it is so ordered.[6]

KOZINSKI, Circuit Judge, dissenting:

According to the majority, the INS errs as a matter of law when it treats aliens who are actually married under the law of their domicile differently from those who are not. Such reliance on state law, the majority holds, is inconsistent with uniform federal application of the immigration laws, is not rationally related to the purposes of the Immigration and Nationality Act and is therefore not a permissible interpretation of that statute.

With this conclusion, I respectfully disagree. Because federal law virtually always relies on state law to define personal and family relationships, the INS's decision to follow state law here is neither bizarre nor irrational. It is the majority's approach—which forces the INS to treat unmarried people as married—that will lead to irrational results and seriously encumber administration of the immigration laws. It's unclear, moreover, why the majority considers this case appropriate for announcing its new rule, as the record here conclusively shows that no American jurisdiction would consider Kahn a party to a valid common law marriage.

## I

The majority opinion gives the distinct impression that reliance on state law in the administration of federal law is uncommon and somehow inappropriate. This is simply not so. Far from shunning state law, federal law frequently relies on it—and without compromising national uniformity. This is invariably the case with questions of family status. By holding that federal agencies may not rely on state law definitions of marriage without express congressional authorization, the majority departs from tradition and precedent.

Take the bankruptcy code. Though we have a single federal bankruptcy system, it relies heavily on state law. *See Butner v. United States*, 440 U.S. 48, 54, 99 S.Ct. 914, 917, 59 L.Ed.2d 136 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law."). For example, under section 547(b) the trustee may recover voidable preferences—that is, property the debtor gave away just before filing for bankruptcy. Yet this federal rule is triggered only if the debtor gave away his "property"—a term defined by state law. *See Barnhill v. Johnson*, —— U.S. ——, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992) ("In the absence of any controlling federal law, 'property' and 'interests in property' are creatures of state law."); *In re: Unicom Computer Corp.*, 13 F.3d 321, 324 (9th Cir.1994) (variations in state law determine whether property held by debtor in constructive trust is included in bankruptcy estate); *G.S. Rasmussen & Assocs., Inc. v. Kalitta Flying Service, Inc.*, 958 F.2d 896, 902 (9th Cir.1992) (state law determines whether FAA Supplemental Type Certificate is property). Various provisions of the bankruptcy code give creditors rights that depend on whether they are secured or unsecured under state law. *See Butner*, 440 U.S. at 52–54, 99 S.Ct. at 916–917. Likewise, whether a debtor can keep his home—that is, whether he can claim a homestead exemption under section 522(d)(1) and, if so, for how much—turns on state law. As a result, debtors in some states do a lot better than identically-situated debtors in others. *Compare In re Hyman*, 967 F.2d 1316 (9th Cir.1992) (under California law, creditors—rather than debt-

---

6. *Yepes–Prado*, 10 F.3d at 1366 ("[A]n error of law ... constitutes an abuse of discretion."); *Jen Hung Ng v. INS*, 804 F.2d 534, 539 (9th Cir. 1986) ("The inclusion of an improper factor in reaching a discretionary decision is grounds for remand."). Kahn also argues the Board erred in reassessing the balance between favorable and unfavorable factors on appeal. However, the Board has "the power to review the record *de novo* and make its own findings of fact." *Cardoza–Fonseca v. INS*, 767 F.2d 1448, 1455 (9th Cir.1985).

ors—benefit from post-petition appreciation in homestead), *with In re Hall,* 1 F.3d 853 (9th Cir.1993) (under Washington law, debtors—rather than creditors—benefit from such appreciation).

Federal criminal law also often hinges on state law definitions. RICO, for instance, relies on many predicate crimes derived from state law. *See, e.g., United States v. Freeman,* 6 F.3d 586, 596 (9th Cir.1993) (reviewing RICO conviction that was based in part on "predicate state law bribery crimes"). Federal law prohibits felons from possessing firearms, 18 U.S.C. § 922(g), but it's usually state law that brands someone a felon. *United States v. Meeks,* 987 F.2d 575, 577 (9th Cir.1993) (Missouri burglary conviction served as predicate offense under section 922(g)); *see also United States v. Frushon,* 10 F.3d 663 (9th Cir.1993) ("Whether Frushon has committed a crime punishable by a term of imprisonment exceeding one year must be determined in accordance with state law.").

Then there's the tax code. Though we have a uniform federal system of taxation, it's intimately tied to state law. For example, spouses in community property states are liable for their one-half share of the community income, while spouses in common law property states are liable only for their own income. *See Poe v. Seaborn,* 282 U.S. 101, 117–18, 51 S.Ct. 58, 61, 75 L.Ed. 239 (1930) ("[D]ifferences of state law, which may bring a person within or without the category designated by Congress as taxable, may not be read into the Revenue Act to spell out a lack of uniformity."); *United States v. Mitchell,* 403 U.S. 190, 197, 91 S.Ct. 1763, 1768, 29 L.Ed.2d 406 (1971) ("[W]ith respect to community income, as with respect to other income, federal income tax liability follows ownership. In the determination of ownership, state law controls.") (citations omitted).

Marital status, as defined by state law, plays a particularly prominent role in the administration of federal law. Social security benefits often hinge on marital status. *See Califano v. Jobst,* 434 U.S. 47, 52–53 n. 8, 98 S.Ct. 95, 99 n. 8, 54 L.Ed.2d 228 (1977); *Purganan v. Schweiker,* 665 F.2d 269, 271 (9th Cir.1982) (construing California law on marital status to determine eligibility for child's insurance benefits under Social Security Act). Marital status—including whether a state recognizes common law marriage—determines who may claim the marital privileges under the Federal Rules of Evidence. *See* Fed.R.Evid. 501; *United States v. Lustig,* 555 F.2d 737, 747–48 (9th Cir.1977); Steven N. Gofman, *"Honey, The Judge Says We're History": Abrogating the Marital Privileges via Modern Doctrines of Marital Worthiness,* 77 CORNELL L. REV. 843, 850–53 (1992).

The most relevant body of law for our purposes is immigration law. Not surprisingly, many of its provisions also hinge on state law, including state definitions of marital status. For example, marrying an American citizen can help an alien gain admittance to the United States. *See* 8 U.S.C. § 1151(b) (aliens married to U.S. citizen become eligible for "Immediate Relative" status). Whether the parties entered the marriage merely to avoid the immigration laws is a federal question, *see* 8 U.S.C. § 1186a, but whether they are legally married depends in large measure on state law. *See* 8 U.S.C. § 1186a(d)(1)(A).

Given the pervasive reliance on state law in a variety of federal statutes, it's hard to say the INS acted irrationally in using state law to determine whether two individuals have a relationship deserving of special deference. To begin with, the INS could rationally attribute significance to the fact that parties have failed to do what's needed to become husband and wife. It's easy enough for Kahn and her boyfriend to say, "We'd certainly be married if only we were living in a state that recognizes common law marriages," but who can tell what their relationship would look like if they actually lived in such a state? Getting married, after all, is not that hard. Failure to take the simple steps necessary to become husband and wife raises a strong inference that the parties prefer to remain unattached. If Kahn and her boyfriend were living in a state that recognizes common law marriages, it is entirely possible they would adjust their behavior to avoid cementing a common law mar-

riage. *See* pp. 1419–20 *infra* (discussing requirements for common law marriage).

Contrary to the majority's central premise, moreover, common law married couples are not in the same position—emotionally, morally or legally—as couples who are merely cohabiting. Couples married under the common law are, in fact, married. *See, e.g., Mattison v. Kirk,* 497 So.2d 120, 122 (Ala. 1986) ("Common law marriages are valid in Alabama, and are co-equal with ceremonial marriages.") (citations omitted), *overruled on other grounds by Carbon Hill Mfg., Inc. v. Moore,* 602 So.2d 354 (Ala.1992). If they separate, they must contend with state law on the separation of married couples. *See People ex rel. Cortez v. Calvert,* 200 Colo. 157, 617 P.2d 797, 798 (1980) (suit filed to declare ceremonial marriage invalid because wife was party to preexisting common law marriage). Should one party to a common law marriage die, the other is eligible to inherit under the state's intestacy statute. *See Piel v. Brown,* 361 So.2d 90, 92 (Ala. 1978). Income of the parties is treated just like the income of married couples; there is alimony and a division of marital assets upon divorce. *See, e.g., Harris v. Harris,* 171 Colo. 233, 466 P.2d 70 (1970) (common law wife seeking temporary alimony in divorce action). If one former spouse enters a common law marriage, the other's support obligations terminate just as if the newlywed had entered a ceremonial marriage. *See O'Dell v. O'Dell,* 57 Ala.App. 185, 326 So.2d 747 (1976).

Couples who are living together in a state that does not recognize common law marriages receive none of these benefits and are bound by none of these constraints. They can go their separate ways any time they please. *See Pickett v. Pickett,* 114 Colo. 59, 161 P.2d 520 (1945) (where there is no common law marriage, divorce proceedings are unnecessary and should be dismissed); Paul Simon, *50 Ways to Leave Your Lover, on* Negotiations and Love Songs 1971–1986 (Warner Bros. 1988) ("Just slip out the back, Jack"). They don't qualify as spouses under the intestacy statute. *Piel,* 361 So.2d at 92. Division of property is not subject to the rules governing marital assets. There's usu-

ally no alimony to pay. *Vigil v. Vigil,* 139 Colo. 325, 338 P.2d 688 (1959) (affirming dismissal of motion for alimony because wife failed to establish common law marriage). *But see Marvin v. Marvin,* 18 Cal.3d 660, 134 Cal.Rptr. 815, 557 P.2d 106 (1976) (palimony).

Because marriage—even of the common law variety—carries serious legal and moral consequences, it's perfectly rational for the INS to accord certain equities only to those so bound. Marriage connotes a level of stability and commitment that simply doesn't exist between unmarried folks, no matter how warm their relationship. This distinction matters a great deal, and the INS is entitled to consider it when discharging the solemn obligations Congress has entrusted to it.

There is yet another reason why the INS's distinction makes sense. Determining whether an alien is married under the law of his domicile is relatively simple; the presence or absence of a marriage license will be dispositive. Even in states that recognize common law marriage, immigration officials need only look to the law of a particular state to determine whether parties qualify. Under the majority's approach, INS officials will have to master the domestic relations law of every American jurisdiction—fifty states, the District of Columbia, Puerto Rico, Guam, the Northern Mariana Islands, American Samoa and the American Virgin Islands—to determine whether unmarried couples living in one place might be deemed married if only they lived elsewhere. The INS is well within its rights in declining this chore. *See EEOC v. Commercial Office Products Co.,* 486 U.S. 107, 124, 108 S.Ct. 1666, 1676, 100 L.Ed.2d 96 (1988) (affirming EEOC's rule in part because it is "easily administered"); *Stowell v. Secretary,* 3 F.3d 539, 544 (1st Cir.1993) (finding that a "cardinal reason deference is due" is because the agency's interpretation is "eminently sensible"—that is, it "facilitates ... administration").

## II

Having substituted its judgment for that of the INS, the majority comes up with a rule that is ill-defined and ultimately no fairer

than the one it rejects. While the majority orders the INS to treat couples as married if they would be deemed married in a state that recognizes common law marriages, the opinion does not explain *which* state's law the INS must henceforth apply. While common law marriages are defined by similar rules in many jurisdictions, the law does differ from state to state. *See generally* 1 Homer H. Clark, Jr., *The Law of Domestic Relations in the United States* § 2.4 (2d ed.1987). Should the INS apply the law of the state geographically closest to the applicant's state of residence? Or the law of the strictest state? The most permissive?

Aside from its uncertainty, this rule is no fairer than that of the INS. After all, once we cast aside the requirement that the parties be married, many couples can plausibly claim they're as good as married, even though they could not be married under the law of any American jurisdiction. What federal interest is served by giving Kahn and her boyfriend favored treatment while denying it to others who—though they cannot qualify for common law marriage—have a long-term physical, emotional and financial relationship? Isn't the case of gay and lesbian couples—many of whom have made long-term commitments and are raising children—a far more compelling one? Kahn and her boyfriend, after all, have the option of getting married; they need only get a license. If, as the majority holds, immigration law must remain unfettered by state law definitions, how can we adopt a rule that's itself tethered to the law of states that recognize common law marriage and so exclude relationships that may be every bit as stable and enduring as common law marriages?

My basic position is that we have no business meddling in this area since Congress has entrusted this responsibility to the INS. *Ayala–Chavez v. INS*, 944 F.2d 638, 641 (9th Cir.1991) ("We show considerable deference to the BIA's interpretation of the statutes it administers."). However, if we are going to reject the INS's state-by-state approach—for the reason, it seems, that this practice is too

dependent on state law—the majority's approach is no improvement at all as it is equally dependent on the vagaries of state law. If a national rule there is to be, we ourselves should look to the statute's text and purpose and announce one. But this task is so removed from our expertise as federal judges, it only underscores that the majority must have taken a wrong turn somewhere.

### III

In any event, it's unclear why this case is appropriate for resolving this thorny issue, since the record shows that—whatever Kahn's relationship to her boyfriend—it's not a common law marriage. The only thing in the record supporting Kahn's claim is her boyfriend's offhand remark that Kahn is "like a common law [wife]." Majority op. at 1413–14. This is not a statement of fact; it's a legal conclusion, something Caldwell is not competent to give. In fact, contrary to popular belief, common law marriages don't arise spontaneously because the parties live together, share expenses, have an intimate relationship and raise children. Rather, there are two very specific requirements. *See* 1 Clark, *Domestic Relations* at 104–05. First, the parties must agree to become husband and wife. *Sardonis v. Sardonis*, 106 R.I. 469, 261 A.2d 22, 24 (1970). Second, they must demonstrate a mutual assumption of the marital relationship. 1 Clark, *Domestic Relations* at 104–05. Simply put, the parties must intend to be married and must hold themselves out to the world as married. *Id.*; *see also Deter v. Deter*, 484 P.2d 805, 806 (Colo.Ct.App.1971); *Smith v. Smith*, 161 Kan. 1, 165 P.2d 593 (1946); *Sardonis*, 261 A.2d at 24.[1]

The record is clear that Kahn and Caldwell do not satisfy the first requirement because they never agreed to become husband and wife. When asked to describe their relationship, Kahn and Caldwell say things like, "We're romantically involved," AR at 101 (Caldwell), or, "[W]e had a serious romantic

---

1. Some jurisdictions, notably Washington, D.C., express the second requirement somewhat differently: "To establish a common-law marriage in the District of Columbia there must be an express mutual present intent to be husband and wife, followed by good faith cohabitation." *Johnson v. Young*, 372 A.2d 992, 994 (D.C.Ct. App.1977).

relationship," AR at 111 (Kahn). But they never say they are married. Quite the contrary, they emphasize that some day they may get married. *See, e.g.,* AR at 101–02 ("We're planning on getting married.") (Caldwell); *id.* at 102 ("We do plan on getting married as soon as this is behind her.") (Caldwell). This, of course, is at war with the notion they're already married. *See Peacock v. Peacock,* 196 Ga. 441, 26 S.E.2d 608 (1943) (intent to be married in future not sufficient to form common law marriage); *see also Piel,* 361 So.2d at 93 (present agreement required for common law marriage).

Nor do Kahn and Caldwell satisfy the second requirement, as they don't hold themselves out as married. Affidavits Kahn herself produced describe her as "the girlfriend" of John Caldwell, not the wife. *See, e.g.,* AR at 149 (Affidavit of James MacKinnon) ("Ruta is the girlfriend of my friend John Caldwell. . . ."); AR at 151 (Affidavit of Steve and Yasmin Ludwig) ("Ruta is the girlfriend of our good friend John Caldwell. . . ."). None of these folks seem to think Kahn and Caldwell are married. It's thus hard to see what this case has to do with common law marriage.

Petitioner, of course, bears the burden of presenting evidence to support her claim. Here Kahn presented nothing to show she would qualify as a common law wife anywhere. Even if we excuse her from making such a showing—perhaps because the INS rejected her legal claim [2]—we cannot ignore the evidence she did present, evidence that establishes she couldn't possibly be deemed Caldwell's wife even if she were living in a state that recognizes common law marriages. Given the way Kahn, Caldwell and their friends characterized the relationship, there's nothing she could say or show to revive her claim.

I therefore can't see why the majority orders the INS to evaluate Kahn's relationship as if she lived in a jurisdiction that recognizes common law marriages. The simple fact is, even if such a claim were available to some other litigant, it's not available to her. This being the case, the majority's pronouncement on the subject is gratuitous, arguably dicta. There is no point, moreover, in remanding. On the record before us, we are perfectly capable of applying our own rule and affirming the INS's decision because Kahn has utterly failed to prove her case.

\*       \*       \*

By purporting to establish a federal law of domestic relations, the majority boldly goes where no federal court has gone before. I respectfully decline the mission.

KOZINSKI, Circuit Judge, further dissenting:

Here is what I thought the majority was saying when I wrote my original dissent in this case: Because Kahn and Caldwell would be deemed common law spouses in some states, they had to be treated by the INS as married even in those states that do not recognize common law marriage.[1]

Evidently I was mistaken. In what purports to be a clarification of its opinion, the majority now severs even that feeble tether between law and family. Untroubled by the novelty of calling two people not related by either blood or law "family," the majority rejects not only state law definitions of marriage, but the notion of marriage altogether. Borrowing from the law of nowhere, the majority commissions the INS to invent a federal definition of "family," one that turns not on any biological or legal connection, but on whether people have a "warm and continuing relationship" that is "close and deeply emotional." Maj. op. at 1415 n. 5. Doubtless

---

**2.** There is no indication in the record that the INS prevented her from introducing evidence to show she would have qualified as Caldwell's common law wife in some other state. In fact, the INS seems to have given Kahn a free hand in presenting whatever evidence she wanted about her relationship with Caldwell.

**1.** Because the majority continues to refer to common law marriages and quotes Caldwell describing their relationship as "like [a] common-law" marriage, maj. op. at 1413–14 it's unclear whether it has abandoned its original approach. I therefore leave my earlier dissent on the books, just in case.

this will make for more piquant transcripts in immigration cases, but is it law? The majority's freestyle adoption of a national definition of "family" falls well outside our competence, and is bad policy to boot.

## I

Nothing in the Immigration and Nationality Act says the INS must take family ties into account when it determines whether an alien who has committed a crime may be granted a waiver of deportation under section 212(c). Instead, Congress gave the Attorney General and her delegates discretion over deportation, an authority courts have interpreted broadly, *Ayala–Chavez v. INS,* 944 F.2d 638, 641 (9th Cir.1991), and the exercise of which is subject to very limited judicial review. *See Abdelhamid v. Ilchert,* 774 F.2d 1447, 1450 (9th Cir.1985). In exercising this broad discretion, the INS has given life to the text of the statute by balancing a petitioner's positive equities against negative factors, a methodology we have upheld as rational. *Id.* at 641 (applying *Chevron v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). In cases such as *Matter of Marin,* 16 I & N Dec. 581 (1978), the INS has elaborated factors relevant to the weighing of the equities, among them a petitioner's "family ties" to the United States. *Id.* at 584.[2]

Given that "family ties" counts as a positive equity only because the BIA itself says

so, our review of how the Board interprets this term is extremely limited. It is not, as the majority suggests, merely the deference due under *Chevron,* which applies to the agency's interpretation of statutory language and already gives the agency much leeway. An agency's interpretation of a standard it has itself adopted is entitled to even greater deference, much like that given to an agency's interpretation of its own regulations:

> When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration.... When the construction of an *administrative regulation* rather than a statute is in issue, *deference is even more clearly in order.*

*Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) (emphasis added). The agency's interpretation of its own standard may only be rejected if it is "arbitrary and capricious," *Montana Power Co. v. EPA,* 608 F.2d 334, 344 (9th Cir. 1979)—i.e., totally devoid of rationality.[3]

So the question we must ask ourselves is this: Had the members of the BIA taken leave of their senses when they decided to treat applicants for section 212(c) relief as having "family ties" in the United States only if they could show familial relationships recognized by the applicable law of domestic relations?[4] I would have thought this question could be answered only one way. My

---

**2.** "Inherent in this discretion [to grant or deny waiver of deportations] is the authority of the Attorney General and his subordinates to establish general standards that govern the exercise of such discretion, as long as these standards are rationally related to the statutory scheme." *Ayala–Chavez,* 944 F.2d at 641.

**3.** The BIA may not simply disregard its own standards and policies in a particular case without giving a reason for doing so. *See Israel v. INS,* 785 F.2d 738, 740 (9th Cir.1986). But this is not a case where the BIA disregarded its own precedents and struck out in a new direction; everyone agrees that "family ties" is the applicable standard. The BIA might fall foul of *Israel* if it refuses to grant outstanding equities to a married couple. *But see* p. 1423 & n. 8, *infra.* But surely *Israel* is not violated by saying that "fami-

ly" in "family ties" means what most people think it does.

**4.** The majority head-butts a straw man when it points out that each of the statutes described in my original dissent "either expressly states or strongly implies that its application is controlled by a person's status under state law." Maj. op. at 1414–15. I certainly don't argue that section 212(c) *requires* the INS to consider state law when it determines family status. My point is that it's more than rational for the INS to do so in light of a large body of federal law where Congress has "either expressly state[d] or strongly implie[d]" that state domestic relations law controls. *Id.* at 1414–15. I find it positively bizarre to say the INS acts irrationally when it emulates Congress's policy in directly analogous contexts.

colleagues, however, reject the INS's approach as totally irrational because they believe that what *really* matters in a relationship is warmth of emotion and depth of commitment, not outmoded concepts such as marriage and legal obligation. This is gross overreaching. One could, I suppose, refer to an unmarried couple as "family" because they share living expenses and a bed.[5] But can we possibly say this is the *only* rational view of what constitutes a family? There is surely still a legitimate view in our society—even way out here in California—that two otherwise unrelated people become a family only when they undertake the legal obligations that go along with being married.

At the heart of the majority's opinion lies a significant policy disagreement with the INS about what types of relationship merit deference in considering an application for section 212(c) relief. The INS has—quite reasonably in my view—decided to limit consideration to the relatively narrow class of status relationships that are already invested with myriad legal and moral consequences. *See* Kozinski original dissent at 1417–18. The majority believes that the class of relationships deserving favorable consideration by the INS should be greatly expanded to encompass all connections between people who live together and have deep feelings for each other.

Whence comes our authority to cram this policy down the BIA's gullet? The statute certainly gives us no support; I challenge the majority to point to anything in the uncommunicative text of section 212(c) that precludes the BIA from recognizing positive equities only where the relationship is between people related by blood or marriage.[6] Congress entrusted the administration of the statute to the INS; the policy choices that govern are the agency's, not ours. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *California v. FCC*, 905 F.2d 1217 (9th Cir.1990).

## II

As I noted in my original dissent, ease of administration is an important consideration in judging the rationality of an agency's implementation of the statutory program entrusted to it. *See EEOC v. Commercial Office Prods. Co.*, 486 U.S. 107, 124, 108 S.Ct. 1666, 1676, 100 L.Ed.2d 96 (1988) (affirming EEOC's rule in part because it is "easily administered"); *Stowell v. Secretary of HHS*, 3 F.3d 539, 544 (1st Cir.1993) (a "cardinal reason why deference is due" is because the agency's interpretation "facilitates ... administration"); *cf. Elden v. Sheldon*, 46 Cal.3d 267, 250 Cal.Rptr. 254, 259, 758 P.2d 582, 587 (1988) (refusing to extend cause of action for negligent infliction of emotional distress to cohabiting fiancees, because only legal marriage offers a "sufficiently definite and predictable test to allow for consistent application from case to case"). The majority's original approach already posed monumental problems of administration for the INS. *See* Kozinski original dissent at 1418–

---

**5.** Although I think it's misguided, I don't go so far as to say that the majority's standard is irrational. Presumably rational judges elsewhere have arrived at a similar conclusion: In *Dunphy v. Gregor*, 136 N.J. 99, 642 A.2d 372 (1994), the New Jersey Supreme Court allowed a fiancee, whose relationship with the decedent was sufficiently intimate, to seek damages for negligent infliction of emotional distress. But as the vigorous (and in my view totally correct) dissent in *Dunphy* pointed out, the fountainhead of bystander liability, the California Supreme Court, has refused to extend the cause of action for negligent infliction of emotional distress to unmarried cohabitants. *See Elden v. Sheldon*, 46 Cal.3d 267, 250 Cal.Rptr. 254, 758 P.2d 582 (1988). The dissenter in *Dunphy* and the majori-

ty in *Elden*—respected (and sane) jurists all—are proof enough that the INS's view is not the product of dementia.

**6.** The majority props up its critique of the BIA's interpretation with a suggestion that the INS is improperly subjugating federal law to state law. Piffle. How can it possibly offend principles of federal supremacy for a federal agency to choose to rely on the existence or absence of legally enforceable relationships? This does not, as the majority claims, give state law "a conclusive veto power" over the BIA's decision; it merely recognizes that the existence of legally enforceable familial obligations is a reliable measure of a petitioner's ties to the United States.

**19. The "new and improved" standard makes matters worse.**

How, pray, will Immigration Judges peer into the hearts and minds of couples to see if they have the requisite "close and deeply emotional" relationship? How does the BIA—or do we, for that matter—review a determination that there are (or are not) sufficiently warm feelings among the parties to make them "family" under the majority's "flexible, uniform standard"? Maj. op. at 1415–16. Depth of feeling is easily faked; it's not all that difficult to bring in chums willing to swear that you're every bit as close as a married couple. Deciding whether two people are married under the law of their state is generally a cut-and-dry matter, and much harder to lie about.

The adoption of a "flexible, uniform standard" may also have other unpleasant consequences. If we are abandoning state law in favor of a uniform national standard, all romantic relationships will have to be judged by this new standard, even if the parties happen to be married under state law.[7] What about those married couples whose relationship has cooled off a bit, maybe grown stale with age? I am more than slightly uneasy about the intrusion into marital privacy caused by giving the INS a charter to investigate whether married couples measure up to some "uniform, flexible standard" of intimacy.[8] The majority has taken a simple determination—whether two people have a certain legally-recognized relationship—and turned it into an encounter group session. I should think the INS is entitled to decline this task on grounds of decorum alone.

**Conclusion**

Whatever one might say about the relative merits of the BIA's and the majority's approaches, it seems to me the BIA is perfectly within its rights in declining to adopt the majority's touchy-feely theory of human relations. Some may agree with the Beatles that "All You Need is Love," but in our society people still regularly get married as a means of formalizing their commitment to each other. The majority shrugs off marriage as an idle gesture signifying nothing, contrary to the great significance it continues to have both in our hearts and in our laws.[9] I cannot agree with the majority that the BIA was irrational in holding that marriage—real, state-sanctioned, old-fashioned marriage—matters. By trying to patch up a shaky opinion, the majority has only made things worse—much worse. I continue to dissent, only more so.

---

7. The New Jersey Appellate Division certainly saw the force of this logic:

> Irrespective of the label placed upon a particular relationship, it is a jury question whether the inter-personal bonds upon which the cause of action is necessarily based actually exist. A defendant should always have the right, *even in the case of a . . . husband and wife*, to test the operative facts upon which the claim is based irrespective of the *de jure* relationship.

*Dunphy v. Gregor*, 261 N.J.Super. 110, 617 A.2d 1248, 1254 (1992) (emphasis added).

8. The California Supreme Court in *Elden* expressed similar concerns:

> A determination whether a partner in an unmarried cohabitation relationship may recover damages for emotional distress based on such matters as the sexual fidelity of the parties and their emotional and economic ties would require a court to undertake a massive intrusion into the private life of the partners.

758 P.2d at 587.

9. "Drawing the line at marriage conforms to the general expectation of society . . . that spouses should be treated differently than unmarried cohabitants," *Dunphy*, 642 A.2d at 382 (Garibaldi, J., dissenting); failing to so draw the line "will cause confusion in many other areas of law in which spouses continue to be treated differently." *Id.*, 642 A.2d at 381 (Garibaldi, J., dissenting). Amen.